Argued April 3, reargued September 11, reversed October 16, 1957

# OMLIE ET UX v. HUNT
316 P. 2d 528

*Douglas L. Hay,* Salem, filed a brief and argued the cause for appellant.

*Roy A. Harland,* Salem, filed a brief and argued the cause for respondents.

Before ROSSMAN, Presiding, and LUSK, BRAND, WARNER, McALLISTER and KESTER, Justices.

KESTER, J.

This is an appeal by John Hunt from an adoption decree, under which his three minor daughters were declared to be adopted by their maternal grandparents, Carl Anton Julius Omlie and Brynhild Omlie. Hunt's wife, Alice Olene Omlie Hunt, the mother of the children and daughter of the petitioner-respondents, died on September 28, 1952. The petition for adoption was filed on October 20, 1952, at which time the girls were aged approximately two, five, and six years respectively. The adoption decree was entered on November 30, 1954.

The adoption decree was entered without Hunt's consent, and over his objection. ORS 109.320(1) provides:

"The parents of the child, or the survivor of them, shall, except as provided in subsections (1), (2), (3), (6) and (7) of this section and in ORS 109.330, consent in writing to the adoption of the child * * *."

Jurisdiction here is predicated on paragraph (6) of ORS 109.320, which provides:

"If either parent * * * has willfully deserted and neglected to provide proper care and maintenance for the child for one year next preceding the time of filing the petition for adoption, the court shall proceed as if such parent were dead * * *."

It is agreed that during the statutory one-year period John Hunt failed to provide proper care and maintenance for the children. He denies, however, that such neglect was willful, and denies that there was any willful desertion. Both willful neglect and willful desertion are required by the statute,[1] and the questions on appeal are: (a) Was there a desertion for the one-year period? and (b) if so, were the desertion and neglect willful? In the absence of an affirmative answer to both questions there was no jurisdiction for an adoption.

A preliminary question of procedure requires consideration. The case was originally tried before the late Judge Kimmell, who passed away before rendering a decision. Thereafter the parties entered into the following stipulation:

"(1) That the testimony and evidence submitted by the parties hereto in the trial hereof to the late

---

[1] Ch 710, Oregon Laws 1957, now provides for adoption without the consent of a parent upon a finding that such parent has "wilfully deserted *or* neglected without just and sufficient cause to provide proper care * * *."

Honorable Rex Kimmell be transcribed and that a copy of said transcript of testimony be submitted to the Honorable Joseph B. Felton for re-trial based upon said transcript of testimony without the court receiving any additional evidence.

"(2) That the court shall interview the respective parties hereto and make such further inquiry from them as the court may desire.

"(3) That said matter shall likewise be submitted to the court upon the briefs or law memoranda heretofore submitted to the late Honorable Rex Kimmell."

The adoption decree recites:

"The Court having considered said transcript and the briefs or law memorandums heretofore submitted, and interviewed the respective parties in accordance with said stipulation and now being fully advised in the premises finds that said petition for a decree of adoption should be granted; * * *."

■ Because of the fact that Judge Felton interviewed the parties, and the record does not disclose the contents of those interviews, respondent contends that the decree is not appealable, relying on *Rea v. Rea,* 195 Or 252, 245 P2d 884, 35 ALR2d 612.

The Rea case arose out of a motion for change of child custody in a suit for divorce. Pursuant to stipulation of the parties, the trial court made or caused to be made an independent investigation, the results of which did not appear in the record. Upon appeal it was held that the case would not be tried de novo, because the full record was not before the reviewing court. In effect, the parties waived their right of appeal by consenting to the trial court's receipt of evidence dehors the record. By its own language the effect of the opinion was limited in the following manner:

"* * * it should be stated that our inquiry is strictly limited to cases in which the independent

investigation relates to the single question of child custody—to the determination by the court of the welfare of a child who is a ward of the court." (195 Or at 257).

In our opinion the Rea case is not applicable here. The stipulation here expressly recited that the case was to be submitted to Judge Felton "for re-trial based upon said transcript of testimony without the court receiving any additional evidence." To avoid internal inconsistency, that provision must be construed as limiting the permission given to "make such further inquiry from them as the court may desire." The trial court's decree recites that he interviewed the parties "in accordance with said stipulation"—i.e., without receiving any additional evidence. To hold that additional evidence was received by means of the interview would be to impute to the trial court violation of the stipulation under which he was acting.

The interview may well have assisted the trial court in determining the character and fitness of the respective parties, in the event that the facts otherwise disclosed the willful desertion and neglect that were jurisdictional for an adoption. That was the kind of purpose the interview served in the Rea case. But it does not follow that the interview had evidentiary value on the existence of the jurisdictional facts. Like a view of the premises, it could assist the trial court in understanding the evidence, without itself constituting evidence. *Molalla Electric Co. v. Wheeler,* 79 Or 478, 484, 154 P 686.

■ Hence, so far as the issues on appeal are concerned, we must assume that the trial court decided the case on the transcript of testimony, as he was required to do by the stipulation. And since the trial court did not have the benefit of actually seeing and hearing the

witnesses at the time their testimony was given, the usual reason for attaching weight to the trial court's finding does not exist. Difficult as it is, this court must decide for itself whether the evidence shows willful desertion and neglect by the natural father.

The record shows that in April, 1950, Alice Omlie Hunt, mother of the children, sustained a paralytic stroke which affected her left side. It is not clear where the Hunts were living at that time, although they had lived both in Vanport and in Portland. From September to December, 1950, the Hunts and the two older children were living with the Omlies at Rickreall, while awaiting the birth of the youngest child. She was born in Portland on December 18, 1950. After the baby was born, John and Alice and the three children spent Christmas, 1950, with the Omlies at Rickreall.

After Christmas, John and Alice took the three children to Vancouver, Washington, where they lived in an apartment for about two weeks. Between the 7th and 10th of January, 1951, Alice returned to the Omlies, bringing the three children with her. Alice was nervous and upset at that time, and according to her father, "in very bad condition." The only explanation in the record for her having left John is that given by him, to the effect that she was perturbed over the fact that they had her father's car, with which he had difficulty, and "she thought I wasn't doing things just right." While John was out on an errand in the evening, he had car trouble which caused him to be late; and when he returned, Alice and the children had taken a taxicab to Rickreall.

After the car was repaired, John brought it back to the Omlies; and he testified that from then until March of 1951 they stayed part of the time with the Omlies, part of the time John was in Vancouver, and

part of the time Alice was in a hospital or at Breitenbush Springs. John explained that they stayed with the Omlies because Alice was unable to take care of the home.

In March, 1951, Alice became paralyzed from another stroke, and her parents arranged for her treatment at the Kabat-Kaiser institute in Santa Monica, California. Her treatment at the institute was paid for by the Omlies, as they were able to do so, and John was not. It is clear from the record that the Omlies did not care for John and had disapproved of the marriage. Therefore, when they sent Alice to California, they attempted to discourage her from seeing him.

However, Alice wrote to John asking him to come to Santa Monica, which he did in April, 1951. After staying there one week he returned to Vancouver and sold their household furniture, and he then returned to Santa Monica in May, 1951, where he rented an apartment and obtained employment. He testified that from that time on they intended to make their home in California. When Alice went to California, the children had remained with her parents at Rickreall, pursuant to an arrangement between Alice and the Omlies. When John went to California, he made no further provision for their care. He testified that he did not tell the Omlies where he was going, because they had said that if John went to California, they would take Alice out of the hospital.

The foregoing events all occurred more than one year prior to the filing of the petition for adoption, but they are necessary background for a proper understanding of the period between October 20, 1951, and October 20, 1952, which is directly in issue.

While Alice and John were in Santa Monica they

sent several packages to the children in Rickreall, including a package of clothes and presents sent in November, 1951. During a part of the time the Omlies had other people caring for the children. Alice's condition gradually improved, up until December, 1951, and at Christmastime that year she travelled to Rickreall for a visit. During that visit she asked her parents to adopt the children if anything happened to her.

Her accommodations at the sanitarium were such that she could have two of the children with her, so when she returned to the institute on January 4, 1952, she brought the two older children along, apparently at her mother's suggestion. The youngest remained at Rickreall. Upon arrival at Santa Monica, John met them at the airport, and Alice and the two children stayed overnight at John's apartment. The next afternoon Alice and the children went to the institute, where they lived until March 28, 1952.

While Alice and the children were at the institute, John visited them; and occasionally he would take the children to a show, or a park, or to lunch. He said that he had them "practically every weekend." He purchased some clothes for the two children, he arranged for them to attend a nursery school for a period of about three weeks, and he paid the school's charges, including breakfast and dinner for the children at the school. However, the expense for the children at the institute was included in Alice's bill, which was paid by the Omlies.

John testified that the Omlies never asked him for any help in caring for the children, and that he had offered assistance, but it had been refused, because the children didn't need anything. Mrs. Omlie said that in April (apparently 1952) John asked if the children needed blouses, and she replied that they had

more than enough clothes. She testified that the children had never wanted anything and have had the very best of everything. Mr. Omlie testified that after Alice died, John asked: "Is there anything I can do to help?" and Mr. Omlie replied: "Nothing now, the children have got all they need right now."

In January, 1952, Alice had a miscarriage, and on January 22, she had another stroke. At that time John took a week off from his work and stayed with her at the institute all week, except for nights. Her mother, Mrs. Omlie, went down to the institute and stayed with her and the children from February 1 to March 28, 1952. John testified that during that time he visited them every few days, but Mrs. Omlie said it was not more than once a week. She testified that on some occasions when John came he was under the influence of alcohol, but John said that while he may have visited there after having had a drink, he was never intoxicated at such times.

On March 28, it appearing that further treatment would be of no assistance, Mrs. Omlie took Alice and the two children home with her to Rickreall. The evidence is in dispute as to whether John knew that they were going at that particular time, John testifying that he came to the institute to visit them and was surprised to find them gone, although he knew that they were intending to go. Mrs. Omlie testified that John knew the date they were planning to leave. Within a few days after they arrived at the Omlies', John telephoned and talked to Mr. Omlie and the two oldest children.

Thereafter the Omlies purchased a home in Salem in order better to care for Alice and the children. John remained in Santa Monica, but he telephoned the Omlie residence several times. On one occasion, in May, 1952,

he was in Portland for his employer and didn't have time to come to Rickreall, but he phoned to inquire about Alice and the children.

In July, 1952, the day after they moved into the Salem home, Alice had another stroke and was in a hospital in Salem until September 17, 1952. On that date she was taken back to her parents' home, where she died on September 28, 1952. John did not know of this stroke, or that she was in the hospital, nor did he know of her death, until later. He said, however, that the Omlies had his address and phone number and could have reached him at any time.

Mrs. Omlie testified that she attempted to phone John, to tell him of Alice's death, but was unable to reach him. She had not tried to call him when Alice went to the hospital for the last time; but Mr. Omlie said that he asked some of John's friends to get in touch with him, as he did not know John's whereabouts. John learned of his wife's death from his own mother around October 10, 1952; and as soon as he knew of it he came to Salem and spent two nights (October 12 and 13) at the Omlie residence, where he visited with the children. Thereafter he returned to Santa Monica, and about October 19 he talked to the Omlies and to the children by phone. He again visited the children at Eastertime in April, 1953.

Although the petition for adoption had been signed on October 3, 1952, John was not advised of it at the time of his visit to Salem on October 12, nor in his phone conversation about October 19. The petition was filed October 20, 1952, citation was served by publication, and an adoption decree was entered by Judge Kimmell on May 19, 1953, by default, upon the representation that John's whereabouts were unknown,

notwithstanding his visit with the children in Salem at Eastertime in April, 1953.

There had been conversations between John and Mr. Omlie about John's ultimately having the children back after John had settled down and established a home. On June 28 or 29, 1953, after John had remarried, he came back to Salem to get the children, and then for the first time learned of the adoption decree of May 19.

John filed a motion to set aside the decree, evidence was taken, and then by stipulation the original decree was set aside. Another hearing was held on the question of desertion, at which the former testimony was incorporated by reference, but before a decision Judge Kimmell passed away. Then, as previously pointed out, the case was resubmitted to Judge Felton, who allowed the adoption.

■ It is clear (and in fact, admitted) that during the year prior to October 20, 1952, John did not contribute in a significant way to the support of the children. However, mere failure to support, particularly when the children are otherwise receiving adequate care, is not in itself proof of desertion, nor does it necessarily prove that the neglect is "willful." It is ordinarily relevant evidence on those questions; although some cases have gone so far as to hold that nonsupport may not even constitute a factor tending to establishing abandonment, where it is excused by the circumstances. Numerous cases are collected in the Annotation in 35 ALR2d 662, at 680 et seq.

■ Desertion or abandonment, with respect to children is usually defined as conduct which evinces a settled purpose to forego all parental duties and to relinquish all parental claims to the child. Anno. supra,

35 ALR2d at 665; 1 Am Jur 643, Adoption § 42; 2 CJS 388, Adoption § 21.

In the present case we are unable to agree with the trial court that the evidence shows willful desertion by the natural father. While his conduct leaves much to be desired, it must be judged against the background of a difficult situation: The illness of his wife, so that she could not care for the children adequately; her sojourn in the sanitarium, where the family could not all be together; the fact that her parents disapproved of him and discouraged his wife from seeing him, so that he felt his moving to California to be with her should be kept secret; the fact that the Omlies were well able to care for the children without help from him, whereas he was of modest means; and the fact that Alice and the Omlies apparently made their own arrangements, without consulting him.

Although the outward evidence of John's interest in the children was sporadic, and perhaps feeble, we cannot say that it was entirely lacking. And at least as to the two older children, his partial provision for them while they were in Santa Monica would interrupt the continuity of the one-year period required by the statute. cf. *Luper v. Luper,* 61 Or 418, 422, 96 P 1099.

In our opinion the evidence is consistent with the view that the children were left with their maternal grandparents by mutual consent, or at least acquiescence, because Alice's illness made it impossible for her to care for them adequately, and because the Omlies were able to provide them with better care than was John. The attitude of the respective parties can be illustrated by the following excerpts from their testimony:

John testified as follows:

"Q Will you state whether or not you and Mr.

and Mrs. Omlie, during the period of time that your wife, the mother of these children, was ill—will you state whether or not you and the Omlies ever had any discussion about where the children should be?

"A No, sir, we have never discussed that, due to the fact that the reason why the Omlies had the children—well, I didn't have any place to take care of them and the wife was ill, so to take the burden off of my family, which I appreciated very much, Mr. and Mrs. Omlie and their daughter, my wife, conferred, and *my wife decided to leave the children with their grandparents* because they were—well, you know, the kids like their grandparents and the grandparents like the children, and—well, you know how it goes. The in-laws stepped in to take the burden off of me because I didn't have a place to take care of the children and no one to take care of them. But that's the reason why the children were brought back to California, because we were going to make our home in California." (Italics ours.)

Mrs. Omlie testified:

"Q And did you also feel that John Hunt wasn't a proper person to raise your grandchildren?

"A Absolutely.

"Q And, therefore, you took over and gave them everything they should have?

"A I didn't took over. *She come and left the children.* It was either me or the welfare to take care of them." (Italics ours.)

With reference to Mrs. Omlie bringing Alice and the children back from Santa Monica, she said:

"A Yes, I told him I was going to take Alice home and take the two children home, and I told him when I come home I was taking Janice and I was going to raise the three sisters up and I didn't want them parted.

"THE COURT: You didn't want them parted?

"A Yes, and so he said he didn't know. He said, 'Do you want Janice too?' And I said, 'Yes, I am going to take all three.' "

Mr. Omlie testified:

"Q Mr. Omlie, you are asking the court here to grant a decree of adoption, do you have love and affection for these grandchildren?

"A Well, I have a selfish motive. I am not interested in the children whatsoever, but I am willing to take care of them so they will not be objects of this court. I don't need the children. I have had all the children I needed, but that is why we are trying to take care of them. I want to be boss because I have spent so much money on them. When he first started to get married I wanted him to prove himself so I knew he was good enough and then I was going to see he got the children back, but I don't want them thrown to the fellow and the wishes of the mother was contrary to giving them back to him. I never wanted them to keep, but just to care for them and the only way we could do that was adopt them."

It will be noted from the italicized portions of the above quotations that it was apparently Alice who decided, after conferring with the Omlies, to leave the children with them in April, 1951. She was, of course, as fully entitled to the custody of the children as was John. ORS 109.030; *Bryant v. Dukehart*, 106 Or 359, 371, 210 P 454.

And when Mrs. Omlie was taking Alice from Santa Monica to Rickreall in March, 1952, it was Mrs. Omlie who declared that she was going to take the children and rear them. At that time John had apparently established a domicile in California, and the domicile of the children, of course, followed that of the father.

*Bryant v. Dukehart,* supra, 106 Or at 367. At that point it was not a case of John leaving the children (speaking of the two older ones), but rather that Alice and Mrs. Omlie were taking them.

Considering the state of Alice's health, it is a reasonable inference that John may not have wanted to upset her by interfering with the plans which she and her mother had made. In the circumstances of this case we cannot hold that John willfully deserted his children by merely acquiescing in an arrangement for their care made between his wife and mother-in-law.

■ We do not wish to be understood as in any way criticizing the Omlies. They have responded generously to the situation, and there is no question—in fact it is agreed in appellant's brief—that the Omlies have provided an excellent home for these children, that they are suitable persons to act as adoptive parents, and that the children's financial future would be much more secure with them than with their natural father. However, in an adoption proceeding the court is not authorized to take children from their natural parent merely because it believes the adoptive parents will provide a better home life. *Hessner v. Bilyeu,* 210 Or 266, 310 P2d 305, decided April 24, 1957.

■ While there is evidence from which we might infer that the welfare of the children would be served by leaving them with the Omlies, we must remember that such an issue was not tried in the lower court. The issue there was expressly limited to the question of willful desertion, and we do not know what the evidence might have been if the trial had been at large upon the question of the best interests of the children. It begs the question to say that the primary purpose of adoption is to promote the welfare of the children, because

there is no jurisdiction for an adoption here unless willful desertion is first established.

If it is contended that John Hunt is not a fit person to have custody of his children, that question can be determined in a proceeding which directly raises the issue. cf. *Larson v. Wellner,* 97 Or 513, 191 P 671.

The adoption decree is reversed, with costs to appellant.

BRAND, J., dissenting.

The parties stipulated (1) that the case "be submitted to the Honorable Joseph B. Felton for re-trial based upon said transcript of testimony without the court receiving any *additional evidence.*"; (2) "That the court shall interview the respective parties hereto and make such further inquiry from them as the court may desire." (Italics mine.) I consider it clear that when the word "evidence" is used in a stipulation filed in a pending suit it refers to evidence which is receivable in a law suit and that the words "without * * * additional evidence" mean without receiving more evidence than that which has been received by the court in the course of the suit. The word evidence is defined by Webster thus: "Evidence. State of being evident; That which makes evident or manifest; One who bears witness. (Rare); Law. That which is legally submitted to a competent tribunal as a means of ascertaining the truth of any alleged matter of fact under investigation before it; means of making proof; medium of proof." Webster's New International Dictionary, Second Edition. When lawyers use the word in connection with litigation they use it in the legal sense. In this case they meant that the court would not reopen the case for the purpose of receiving additional sworn testimony. Only by so construing para-

graph (1) of the stipulation can it be harmonized with paragraph (2) thereof which authorized the court to *"interview* the respective parties  \*  \*  \*  as the court may desire." (Italics mine.) I too would avoid "internal inconsistency" in the stipulation, but not by construing away the provision authorizing the court to interview the parties. Are we to assume that the court was merely to sit and look at the plaintiff and defendant without conversation, as a jury views the premises? Or are we to assume that it was understood that the court was to desire only to discuss the weather with them, or some other subject irrelevant to the issues of the case? As realists we must know that when the court in its decree said it had interviewed the respective parties it meant that it had made "inquiry" concerning the merits of the case;—otherwise, why mention the interview?

*Rea v. Rea,* 195 Or 252, 245 P2d 884, involved a question of child custody. In it we held that the right of appeal and a fortiorari the right to a trial de novo is not a constitutional right but a statutory privilege which may be waived and that if parties agree upon an independent investigation they do so knowing that the record. will be incomplete and that the Supreme Court sitting in equity will not try a case de novo unless the entire record is before it. The decision was limited to the facts of the case, but the principle there set forth applies with double force in the case at bar. In the Rea case the court was considering one of the broad sociological and psychological problems which arise when the issue is the welfare of an infant. If there is any similarity between a view of the premises and an independent investigation by a judge (which we doubt), it would be found in the kind of investigation which examines the home conditions under which

the competing parents are living, or which observes the infant to ascertain its attitude toward the parents.

In the case at bar the issue presented a cold question of law and fact, to wit, had the defendant wilfully deserted and neglected his child? The majority suggests that the interview may have assisted the trial court in determining the character and fitness of the respective parties, but this was not a custody case and fitness was not the issue. The interview was with the contesting parties, not with the child.

In *Rea v. Rea* we took notice of the conflict between the legal and the sociological approach in child custody cases. (195 Or 257). That conflict does not appear in the pending case. There is no more reason for a trial judge to interview the parties in a desertion case than there is in a suit to quiet title, or an automobile damage case. In *Rea v. Rea* we said at 258:

"* * * Any person who desires to stand upon his strict legal rights, and to preserve his right of appeal to this court, may insist that no fact should be brought to the attention of the trial court and that no influence should be exerted upon it, except in the manner of the common law, by testimony and argument in open court, with the right accorded to both parties to testify, to produce witnesses, and to confront, cross-examine or contradict adverse witnesses. * * *"

We recognized that even in so fundamental a matter as the right to a public trial according to the course of law, parties may consent to investigations, extrajudicial in nature, and a court may in its discretion act upon their consent or stipulation, but we then held, and I think we should now hold, that when the parties have voluntarily departed from standard judicial procedure they waive any right of appeal for the simple reason

that the record which they send to this court is not shown to be the record on which the trial court acted. If for a moment we should abandon legalistic reasoning and look at the case as practical men, I suspect that we would all agree that the interview and "further inquiry" made by the trial court had something to do with the merits of the case. At least it should be agreed that the record fails to show that the evidence here is the sole basis of the trial court's decision.

I am of the opinion that the defendant has waived his right of appeal, and under the facts of this case, the result is not an unjust one.

ROSSMAN, J., dissenting.

The transcript of evidence has been read twice by me and I have studied the briefs carefully. The impression of John Hunt, the father of the three little girls who are the subject matter of this proceeding, which I gained from the readings is basically different from the conception of him which the majority entertain. In the record is a description of him which was written by the State Welfare Commission, obedient to ORS 109.310(3), and which says, in part:

"He did not complete grade school. * * * He is described as being completely unstable and unreliable, and it is reported that he drinks to excess. His present whereabouts is unknown."

Judge Felton, the capable circuit court judge, from whose decree this appeal was taken and who saw Hunt, expressed an unfavorable opinion of him in a comprehensive memorandum opinion from which the following is taken:

"He knew that his wife, the mother of the children, was seriously ill. He knew that when she left California in March of 1952 and returned to Salem

she was going to die.   *   *   *   Although he was fully aware of his wife's physical condition, he made only one inquiry concerning his wife and children after they had returned to Salem."

The memorandum opinion continues:

"While the two older children were in California in the early part of 1952 and the father made arrangements to place the children in a nursery school for several weeks, and even though he was steadily employed at a good wage, he attempted to borrow $40.00 from Mrs. Omlie to defray the expense incident to the children being in the school."

Thus, that expenditure of $40, which was by a wide margin the largest Hunt ever made for his children, was given grudgingly and was paid by Hunt individually only because he could not get the money from Mrs. Omlie. I quote further from Judge Felton's opinion:

"*   *   *   and, if we wish to say it that way, during that year and prior thereto, his presence, his care, his love, protection, maintenance and opportunity for the display of filial affection certainly came in pitifully small dribbles.

"*   *   *   I think the father's intent is conclusively demonstrated by his conduct as established by the evidence in this case. By no stretch of the imagination can it be said that the father's conduct was excusable and justifiable.   *   *   *

"What would have been the fate of his children had it not been for the Omlies? That is a question that the father, in view of his conduct, cannot answer."

Such was the opinion of Hunt which Judge Felton formed after studying the evidence and talking with him. [See the stipulation mentioned in the opinion of the majority and of Mr. Justice BRAND].

The Omlies, who, Hunt concedes, took excellent care of the children and who, he admits, "are fit and proper

persons to adopt said minor children," expressed their disappointment in their son-in-law upon more than one occasion. Their ill opinion of him was not based upon whim, caprice or prejudice, but was the result of their experience with him which showed that he was unstable and untrustworthy. The following is taken from Mr. Omlie's testimony:

"Q You say you have nothing against him?

"A Nothing personal, as far as the man is concerned, but I have against the way he wanted his family.

"Q You never approved of the marriage, did you?

"A No.

"Q Did you ever feel he was good enough for your daughter?

"A Plenty good enough if he would have behaved himself.

"Q Did you ever think he was good enough to be the father of your daughter's children?

"A Yes, if he had taken care of them.

"Q But you didn't think he was good enough the way he acted?

"A He wasn't good enough to be a father that way."

The above shows that those who have dealt with Hunt and have not been compelled to gain their impression from court reporters' notes do not entertain the opinion of Hunt which the majority have drawn.

Only three witnesses gave testimony in this proceeding—Hunt and the two Omlies. Hunt did not challenge or contradict the testimony of the Omlies in any particular. The Omlies are, plainly, people of good character who sought unselfishly to perform a tender service for three little girls whose stricken mother could not care for them, and whose father would not.

The record offers no reason whatever for rejecting anything that the Omlies said as untruthful; but, as we have seen, Hunt has been described by a responsible source as "completely unstable and unreliable." Yet the majority manifest a peculiar preference for his testimony. They view his indifference to his children with benign tolerance and, by giving him the benefit of inferences and surmises, find in him traits which, I believe, ill befit a man who, in the language of the street, walked out on his children when they needed a home and a father.

Although the record shows clearly that Hunt lacks a sense of responsibility, it reveals a defect in his nature which is even more relevant to this case. It shows that he has never taken himself seriously as a father and has never recognized the duties that are owed by a father to his offspring. The latter have never been a factor in his life and have not engaged his thoughts. His predominant hankering has been to be carefree and foot-loose. If he had had affection for his children or a yearning for their company, he could not have voluntarily abandoned them to the Omlies nor lived in one city while they were in another. He was able-bodied and had an income adequate to the needs if he wished to provide a home for his children. His mother was near at hand to help him maintain a home if he needed help of that kind. Even non-relatives, who have fondness for each other, occasionally denote that fact by the sending of little tokens of friendship. But tokens of affection for his little daughters were so lacking in Hunt's treatment of them that he seized upon an occasion in November of 1951, when it developed that "two or three packages" were sent, to claim that he himself sent them. But, after admitting that he could not recall the contents, he shortly conceded that

it was his wife who made the purchases and mailed them. If he ever was with his children during the holiday season or upon their birthdays, he wholly failed to mention the fact. From the fact that he sought to lay false claim to the "two or three packages" for the children that his wife bought and paid for in November of 1951, and the fact that he mentioned no others, I assume that he never gave his children any birthday or holiday presents. Hunt's interest in his children was so meager that he was able to wander off for undisclosed destinations without giving them any thought and without making for them even the slightest provision. Before disappearing he would not bid the children good-bye or leave with the Omlies an address or telephone number so that he could be summoned in the event of necessity. I assume that I need not add that before departing he would never leave with the Omlies even one dollar with which they could provide care for his children, nor would he assure himself that the Omlies would assume the responsibility which he was shirking. In virtually all instances he did not even tell the Omlies that he was about to go. Let us take an example. After his wife's death he made a short call upon the Omlies and at its conclusion, when he was asked where he could next be reached, gave this answer, according to Mrs. Omlie's uncontradicted testimony: "He said he got roped into some kind of atom high secret and he couldn't tell where he was going." That was his answer. The majority indicate that Hunt was induced to withhold his address from the Omlies for fear that they might interfere with his relationship with his wife, but the above answer, representative of others which he had made, was given after the wife's death.

Bearing children does not always make a woman

into a mother, and, likewise, procreating children does not necessarily make a father out of a man. In the latter circumstance we very likely have the explanation for the long-continued indifference which Hunt has manifested for his children. He is averse to the duties of parenthood and prefers to be out with the boys. He has no interest in the children.

The majority state:

"It is agreed that during the statutory one-year period John Hunt failed to provide proper care and maintenance for the children."

That concession is well justified. Circuit Judge Kimmell, before whom the testimony was taken, conducted the following examination of Hunt:

"Q I should like to ask you this: Between October, 1951, and October, 1952, would your children have survived on the support you gave them?

"A I didn't give them any, sir.

"Q Your answer would be 'no' then?
"A Yes, sir.

"Q You were able-bodied at that time?
"A Yes, sir.

"Q And working?
"A Yes, sir."

Hunt is able-bodied. Throughout the period with which this cause is concerned he was steadily employed at good wages. He makes no intimation that in the long period in which he contributed nothing for the support of his children he had any obligations whatever that he sought to meet. Nothing in the record relieves or diminishes the effect of the answers which Hunt made to Judge Kimmell's questions.

In order to avoid misunderstanding, let us take note of the fact that the word "willfully" as employed in

subsection (6) of ORS 109.320 (adoption statute) does not mean maliciously or with evil purpose. It exacts nothing more than to require that the parent, who is charged with having deserted and neglected his children, acted wittingly and voluntarily. ORS 161.010 says:

"'Wilfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or omission referred to, and does not require any intent to violate law, to injure another or to acquire any advantage."

From the foregoing we see that ORS 109.320 requires nothing more than volitional or voluntary desertion and neglect.

An Oregon parent owes a statutory duty to support his children. ORS 109.010. The fact that the grandparents gave the children a home and maintenance did not excuse Hunt's neglect. 67 CJS, Parent and Child, § 15(b), p 690. *State v. Langford,* 90 Or 251, 176 P 197, says:

"* * * according to the great weight of judicial opinion and according to what we believe is the plain intent of our statute, the fact that the mother alone or together with other persons furnished all the support needed for the child does not constitute just or sufficient cause for any failure by the father: * * *."

Since Hunt, throughout the pertinent period, was steadily employed at good wages and had no obligations except to his wife and children (both of whom he neglected), there can be no doubt but that his neglect was willful.

An annotation in 35 ALR2d 683, says:

"However, it has been held or recognized in many cases that the wilfull failure of a parent to

provide support for his child is at least one factor tending to establish an abandonment or desertion, * * *."

If the rule stated in the annotation just quoted, which is based on good sense, were applied to this case, the decree challenged by Hunt would be affirmed; but the majority seem to think that Mrs. Hunt entered into some sort of understanding with her parents for the maintenance of the children which now can be employed to acquit Hunt of his long-continued neglect of the children.

I can find no warrant in the record for the majority's conclusion that the Omlies agreed to care for the children—certainly none that they agreed to relieve their son-in-law of his duty to provide a home and care for his offspring. Very likely Mrs. Hunt felt when ill health overtook her that her parents would accept the children and care for them, but there is nothing in the record which indicates that the Omlies were prompted by anything except compassion and a spirit of parental duty. It is crystal clear that they had no thought of relieving Hunt of any of his duties. To the contrary, they had the wholesome desire possessed by all parents-in-law that their son-in-law would establish a home and take care of his children in a creditable manner. Nothing in the record suggests that the Omlies coveted the three little girls for their own home and were thereby disposed to relieve Hunt of his duty. To the contrary, it shows that they wanted him to develop a sense of responsibility and attend to his family. They accepted the children only when their daughter, a helpless invalid, departed for the sanitarium and Hunt vanished from sight. They had no alternative. Mrs. Omlie expressed the situation bluntly in this way: "She (Mrs. Hunt) come and left the chil-

dren. It was either me or the welfare to take care of them." The following is taken from her further examination:

"Q Mrs. Omlie, did John Hunt ever ask you for the custody of the children during that time?
"A No, never.

"Q Did he ever say he wanted to take the children with him and establish a home?
"A Never."

That testimony is uncontradicted and unchallenged. Hunt made no effort to diminish its import or relieve him therefrom. Mr. Omlie testified, in part:

"I am willing to take care of them so they will not be objects of this court."

More could be quoted from the testimony which would amplify and add further significance to the above quotations. The two testified at length that Hunt was always welcome in their home and that they were eager for him to come and display an interest in his children. They placed no limitations upon him in that respect. It is significant that he made no effort to contradict that testimony.

The above shows that the three little girls were virtually left on the doorstep of the Omlies' home. Obviously, the mother, as a victim of paralysis, was helpless, and, since her husband shirked the duties of parenthood, she had no alternative except to bring the children to her parents. The conclusion is inescapable that when his wife's incapability demanded that Hunt should provide a home and fatherly attention for his helpless children, he shunned the duty and preferred the life of the carefree.

Shortly after the Omlies sent their daughter to the sanitarium in Santa Monica which treated paralytics,

Hunt left for Santa Monica. Before going he did not bid his children good-bye or make any provision whatever for them. He did not even leave a forwarding address so that he could be reached if the children, whom he was abandoning in such an unfatherly manner, needed help.

The above facts establish willful neglect and indicate that the Omlies never entered into any understanding which released Hunt from his duties as a parent.

In their treatment of the situation, the majority deal with this case as though the only responsibility which a father owes to his children is to provide them with food. But the Old Testament declares: "Man doth not live by bread alone" and the decisions point to the duty of the parent to devote to his child sufficient time, thought, affection and guidance so that it will develop into a useful member of society. *In re Watson's Adoption,* 238 Mo App 1104, 195 SW2d 331, says:

> "A wilfull abandonment then would seem to imply * * * an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance and the opportunity for the display of filial affection."

Schouler, Marriage, Divorce, Separation and Domestic Relations, 6th ed, § 772, declares:

> "The three leading duties of parents as to their legitimate children are recognized at the common law: *First,* to protect; *second,* to educate; *third,* to maintain them. Those duties are all enjoined by positive law; yet the law of the natural affections is stronger in upholding such fundamental obligations of the parental state."

Let us now see the extent to which Hunt discharged the duty of bestowing upon his children fatherly care,

affection and guidance so that they would develop good character and eventually become creditable members of the community. He has scarcely seen the youngest of his three children. She is virtually a stranger to him. If he ever sent her an affectionate message or endearing gift, the record is entirely silent upon the subject. Yielding effect in full to his own testimony, the following constitutes all that he did for his other two children in the period of January 1, 1951, to October 10, 1952: (1) he purchased for each of the two older girls a pair of jeans and some other garment; (2) while he was present, his wife sent to the girls "two or three packages" the contents of which he described in this way: "I don't know exactly what all the wife put in the packages. She sent those packages"; (3) "I'd taken them to a show and taken them to lunch a time or two, I don't recall exactly how many times"; (4) during a period of about two and a half weeks, while his wife lay helpless in the sanitarium, he provided day nursery facilities for the two older girls at an expense of $7.00 per week for each.

Hunt conceded that he never gave the children any money. He also conceded that while his wife was in the sanitarium he frequently had his dinner in its dining room and had the price charged to the Omlies. The foregoing is all that this father did for his children in the period of January 1, 1951, to October 10, 1952. Surely, no one can say that he discharged his duty to give his children his presence, attention, care, affection and guidance.

I shall now mention other facts which show his neglect of his family. December 18, 1950, Janice, the youngest of the three children, was born and after Christmas Hunt drove the family of five to Vancouver, Washington, for a visit. Prior to that, Hunt, his wife

and the children had lived for several months with the Omlies. January 3, 1951, Mrs. Hunt and the three children returned in a taxicab to the Omlies' home at three in the morning. Some unhappy incident had taken place. From that day on Hunt never provided a home for his wife or children. When he returned from Vancouver a week after his wife and children, he, too, took up his abode with the Omlies. Presently he sold the family's few belongings, including the tricycles which the Omlies had given to the two older children.

Since it is a father's duty to provide a home for his children, is it not pertinent to ask why did not Hunt provide a home for his children after the group had returned from Vancouver, if he had affection for his children. Many husbands who have invalid wives maintain homes and take care of the wife and children in it.

April 4, 1951, Mrs. Hunt, at the expense of her parents, went to the sanitarium in Santa Monica and stayed there until the following Christmas, virtually nine months. In the meantime, the three children remained with the Omlies in their home in Rickreall. So far as the record indicates, there was nothing to prevent Hunt from securing a home and moving the children into it with him. His mother lived nearby and could have helped him manage the home. But, in lieu of taking care of his children at the hour when they needed a father's help, he departed for Santa Monica without saying a word to his children or the Omlies. In the succeeding nine months he provided them with neither a home nor maintenance. Of course, he did not see them in that period and did not communicate with them.

At Christmastime of 1951 Mrs. Hunt, at the expense of the Omlies, came north and spent Christmas with her children and parents in the Omlies' home.

Hunt did not come. January 4, 1952, she returned, at the Omlies' expense, to the sanitarium. Upon Mrs. Omlie's recommendation, she took the two older children with her. Some months prior to that time Hunt—if his word can be believed—had decided to establish a home in Santa Monica. He was employed there in an airplane factory. Yet when Mrs. Hunt returned to the sanitarium with the two little girls and had no place to care for them except in her hospital room, Hunt did not provide a home. If a father owes a duty to provide a home for his children, surely it can be said that the time had come for this father to respond to that duty. No one would have interfered with him if he had established a home. Seemingly, he never gave the matter even a fleeting thought. Three weeks later, Mrs. Hunt suffered a second stroke which, according to Hunt, was so severe that she "couldn't talk and couldn't move." Yet he left the little girls in the mother's room, and it evidently never occurred to him that it was high time for him to provide a home for his offspring. Presently, the Omlies, upon hearing of their daughter's plight, came to her bedside.

March 28, 1952, when the sanitarium reported to the Omlies that treatment could help Mrs. Hunt no further, they returned her to their home in Rickreall. Hunt had known of the plan for two weeks and, as we have said, had long claimed a purpose to establish a home for his family in Santa Monica, but he did not protest against the Omlies' plans to move his wife to Rickreall nor declared that he wished to keep his wife and children with him. To the contrary, Mrs. Hunt and the children departed without even a word of well wishes from him. He remained in Santa Monica and was still there September 28, 1952, when his wife died. After the Omlies brought their daughter north they pur-

chased a spacious home in Salem for themselves, their daughter and the three children.

Before the date of departure from Santa Monica Mrs. Omlie asked Hunt for his address and telephone number so that, in the event of necessity, she could communicate with him. He gave her a telephone number which, it developed, was that of his employer, who had tens of thousands of employees. As a result, the Omlies were unable to summon him, notwithstanding their diligent efforts, when the following events occurred: (1) July 17, 1952, Mrs. Hunt suffered a third stroke which was very severe; (2) September 28, 1952, Mrs. Hunt died; (3) three days later the funeral service was held.

The oldest of the three children is now almost eleven years old. All three are now enrolled in school. They have not lived with their father since January 4, 1951. In the meantime, they have formed their attachments in the neighborhood and at the school which they attend. The evidence indicates that the children have made good progress.

I shall bring this dissent to a close by copying the following from the annotation in 35 ALR2d 664:

> "A degree of judicial impatience with the vagaries of parents has been manifested in a number of cases in which there is evidence of conduct constituting an abandonment or desertion, but in which there is also evidence of later parental repentence, and the termination of such conduct. Although it appears to be generally conceded that repentence or termination may be effected prior to adoption, many courts will not permit such a termination to be effective to prevent an adoption, where the conduct has continued for a prolonged period, and where, because of new ties formed by the child, his

welfare would be jeopardized by refusing the adoption. In some jurisdictions, the requisite duration in time of the abandonment or desertion is provided by statute."

I dissent.