Argued September 23, affirmed November 26, 1971, petition for
rehearing denied January 4, petition for review
denied April 11, 1972

IN THE MATTER OF NANCY DRAPER, A CHILD

# STATE EX REL JUVENILE DEPARTMENT OF MARION COUNTY, *Respondent, v.* DRAPER, *Appellant.*

491 P2d 215

*Robert B. McConville,* Salem, argued the cause and filed the briefs for appellant.

*Don S. Dana,* Deputy District Attorney, Salem, argued the cause for respondent. On the brief was Gary D. Gortmaker, District Attorney, Salem.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

SCHWAB, C. J.

The father, Milton Draper, appeals from an order of the juvenile court following a hearing in November of 1970, which terminated his parental rights, pursuant to ORS 419.523(2)(b),[1] for neglecting, without just and sufficient cause, to provide proper care and maintenance for his daughter, Nancy, for one year.

At the time of the termination proceedings, the child was three years old and the father had neither

---

[1] ORS 419.523 provides:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in

seen her nor tried to make any contact with her or those caring for her since she was about four months old. During that time he had not contributed anything toward her support.

Mr. and Mrs. Draper were residents of Las Vegas, Nevada. Nancy was born there on November 12, 1967. The parents separated in March 1968. Mrs. Draper continued to live in Las Vegas for a short while and then went to Salem, Oregon, in the company of another man, taking Nancy with her. The man had relatives in Oregon.

In September 1968, Mrs. Draper gave the baby to a sister of the man she accompanied to Salem, telling the sister she (the mother) could not take proper care of her. Shortly thereafter the sister filed a petition in the circuit court of Marion County asking the court to take jurisdiction of Nancy as a dependent child.

A hearing was held on this petition on September 24, 1968. The proceeding was continued for further evidence and further hearings were held on December 10, 1968, and April 15, 1969. After the last hearing, the court took jurisdiction, made Nancy a ward of the court, and placed her in the temporary custody of the Marion County Public Welfare Commission.

this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"* * *

"(b) Have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year * * *."

The Welfare Commission continued physical custody with the woman who was caring for the child.

Mrs. Draper appeared and testified at the first hearing on September 24, 1968. Her testimony was substantially as outlined above. She then returned to Las Vegas, leaving Nancy with the sister, and did not participate in any of the subsequent proceedings.

Mr. Draper had remained in Las Vegas and was unaware of the wardship proceedings until May of 1969. By late 1968 at the latest he knew that his wife had taken Nancy to Oregon, that the man with whom she had gone had relatives in Oregon, and that she had returned to Nevada without the child. He occasionally saw his wife after she got back, but testified that she refused to tell him where the child was other than that she "was in good hands." In late 1968 or early 1969, the Marion County Public Welfare Commission tried to contact Mr. Draper. At its request, the Nevada Welfare Division wrote Mr. Draper a letter asking him to come in to talk about his daughter. Mr. Draper made no response to this letter and gave the following explanation at the November 1970 hearing:

> "* * * [T]hey didn't say anything about what it was about, but I figured they were trying to get me to sign some kind of papers releasing her. I didn't go because I felt they might pressure me into it. I figured as long as I didn't sign anything, they couldn't take her away from me."

He offered no explanation of what led him to this belief.

On May 8, 1969, Mr. Draper obtained a divorce in Las Vegas. During the preparations for this divorce, his attorney learned that Nancy was in the custody of the public welfare authorities in Oregon. The di-

vorce decree recited this fact and made no order with respect to care, custody or support. As of that time, at the latest, Mr. Draper had reliable information about his child. He did not contact the welfare authorities or anyone else, directly or indirectly, about the child.

On May 27, 1970, a caseworker of the Marion County Public Welfare Commission filed a petition asking the court to terminate the rights of both parents under ORS 419.523(2)(b). Both were served with notice of hearing.

The mother did not appear and her rights were terminated as of August 18, 1970.

The father appeared and testified at the hearing which took place November 17, 1970. The reason he gave for not contacting the Oregon Welfare Commission was that he did not feel he could provide proper care for a child after his separation and divorce and decided to do nothing until he was in a position to take her back.

Mr. Draper had remarried in September and both he and his new wife testified that they would like to have Nancy come live with them. His testimony was equivocal, but at one point the evidence showed that his income had averaged about $800 a month during the past year.

■ The father made no contribution toward the support of his daughter during the year in question. A parent has a duty to support his child, ORS 109.010, and this duty exists independently of any court order. *State v. Langford*, 90 Or 251, 176 P 197 (1918).

The father contends that his failure to pay support was due to lack of knowledge about his daugh-

ter's whereabouts and the fact that he did not take steps to learn more about her cannot be construed as willful, intentional neglect. The state, on the other hand, contends that his lack of knowledge was of his own making—a result of his voluntary decision not to respond to the letter from the Nevada Welfare Division and not to contact Oregon welfare—and argues that this failure to act constitutes parental neglect within the meaning of ORS 419.523(2)(b).

We need not decide whether the father's inaction in this case evinces a settled purpose to permanently sever all relationships with his child within the meaning of the word "abandonment" as defined by *Omlie et ux v. Hunt,* 211 Or 472, 482, 316 P2d 528 (1957):

> "Desertion or abandonment, with respect to children is usually defined as conduct which evinces a settled purpose to forego all parental duties and to relinquish all parental claims to the child * * *."

At the time *Omlie et ux v. Hunt,* supra, was decided, the statute (ORS 109.320(6) (repealed Oregon Laws 1957, ch 710, Section 1, p 1237)) required proof of both willful neglect and willful desertion.

> "* * * Both willful neglect and willful desertion are required by the statute, and the questions on appeal are: (a) Was there desertion for the one-year period? and (b) if so, were the desertion and neglect willful? In the absence of an affirmative answer to both questions there was no jurisdiction for adoption." *Omlie et ux v. Hunt,* 211 Or at 474.

*Omlie et ux v. Hunt,* supra, concerned a petition for adoption which was opposed by the father as distinguished from a termination proceeding. The result is the same regardless of whether (so far as a resist-

ing parent is concerned) the proceeding involves a petition for adoption over the objection of a non-consenting parent or a petition for termination of parental rights filed by the state. It follows that the standards for determination are the same. *Moody v. Voorhies*, 257 Or 105, 475 P2d 579 (1970).

In 1957, the legislature modified the adoption statute under which *Omlie* was decided (ORS 109.320 (6) (repealed Oregon Laws 1957, ch 710, Section 1, p 1237)). The current statute, ORS 109.324, is in the disjunctive, "* * * wilfully deserted *or* neglected without just and sufficient cause to provide proper care and maintenance for the child for one year * * *."[8] (Emphasis supplied.) In 1963, the wording of ORS 419.523(2)(b) was amended to conform to the language of ORS 109.324.[9]

■ Proof of neglect does not require proof of intent

---

[8] *See*, Minutes of the House Judiciary Committee, May 3, 1957, which deleted "and neglected" from HB 379 (Oregon Laws 1957, ch 710, p 1237) and inserted "or neglected without just and sufficient cause."

[9] When the Senate Judiciary Committee considered changing the wording from "abandonment" to "wilfully deserted or neglected without just and sufficient cause * * *," it had before it a Report of the Legislative Fiscal Committee to the Fifty-Second Legislative Assembly, Public Welfare (1962), which discussed Oregon case law and the difficulties of proving abandonment under the existing statute. The Committee added:

"* * * In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions." ORS 419.523(2)(b).

Apparently, the 1963 statutory changes and additions were made with the intent to allow termination in situations which did not fall within the strict interpretation of the word "abandonment."

"In numerous instances, the State Public Welfare Commission must ask the courts to terminate the parental right of a

to forego all parental rights. Neglect may be shown by evidence that the parent voluntarily failed to pro-

missing parent of a child on welfare in order to make the child available for adoption. As of August 14, 1962, there were 41 children on welfare who would be adoptable if parental rights were terminated. Until such rights are terminated, the child remains on public assistance despite a de facto desertion and although as a general rule the child's best interests favor adoption. Each year of delay in terminating parental rights in cases where such termination is considered proper makes more difficult the task of finding a suitable adoptive home * * *." Report, supra, at 141-42.

Larsen, *Trends and Developments in Oregon Family Law: Parental Rights and Child Welfare*, 43 Or L Rev 193 (1964), attached significance to the change:

"In 1963 the Legislature also amended Or. Rev. Stat. sec. 419.523 (1963) to change one of the two grounds for permitting the juvenile court to terminate parental rights. It eliminated abandonment as a ground and substituted wilful desertion or neglect without just and sufficient cause to provide proper care and maintenance for the child for one year. This standard is identical with that stated in Or. Rev. Stat. sec. 109.324 (1963) as one of the grounds for dispensing with consent in an adoption proceeding. Since termination of parental rights by a juvenile court is often a preliminary step to adoption, such uniformity seems sensible.

"This amendment frees the juvenile court from the technical restrictions which have been judicially engrafted on the concept of abandonment, restrictions which have frequently allowed a parent to block the termination of parental rights for the best interests of the child just because he has maintained a few spasmodic and perfunctory contacts with the child. Anticipating the possibility that the court might apply similar restrictions to the new standard, the Legislature provided:

"In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions.

"This liberalization of one of the grounds for terminating parental rights will probably lead to an increase in the incidence of such termination orders, with correspondingly greater involvement by attorneys in the proceedings of the juvenile court." 43 Or L Rev at 207-08.

vide for his child for the required statutory period. Such failure may not always be accompanied by a parental decision to have nothing whatsoever to do with a child in the future.

In the present case, the father abandoned all parental duties of support and care, but he testified that he thought he might at some time want to get the child back. This testimony, if believed, can be construed to mean that he had no intent to abandon all parental rights—a necessary element of "desertion." *Moody v. Voorhies,* supra, at 110.

So long as the statute required both abandonment and neglect, the language about neglect might well have been considered surplusage since failure to support was in itself not grounds for termination, but was only relevant evidence on the question of desertion.

"* * * However, mere failure to support, particularly when the children are otherwise receiving adequate care, is not in itself proof of desertion, nor does it necessarily prove that the neglect is 'willful.' It is ordinarily relevant evidence on those questions; although some cases have gone so far as to hold that nonsupport may not even constitute a factor tending to establishing abandonment, where it is excused by the circumstances * * *." *Omlie et ux v. Hunt,* 211 Or at 482.

We do not construe the disjunctive statutory phrase, "* * * neglected without just and sufficient cause to provide proper care and maintenance * * *," as requiring intent to abandon all parental rights. However, that portion of the statute does require proof that the parent failed to perform parental duties for the required statutory period and that his neglect

was voluntary (*State v. Francis,* 126 Or 253, 269 P 878 (1928); *State v. Langford,* supra), and intentional (*Wilcox v. Alexander et ux,* 220 Or 509, 349 P2d 862 (1960)).

"The parties here are not certain that the word 'wilful' in the statute applies to both 'deserted' and 'neglected without just and sufficient cause to provide care * * *'.

"We think it is immaterial. The requirement that the nonsupport must be without 'just and sufficient cause' denotes an equivalent, if not broader, stricture than 'wilful'. No court would allow an adoption for nonsupport only unless the failure to provide was by intentional, deliberate or wilful design. The language of ORS 109.324 requiring the nonsupport to be 'without just and sufficient cause' is identical to the language of ORS 167.605 which makes it a crime to fail to support a wife or child 'without just and sufficient cause.' It is apparent, therefore, that the legislature intended that the nonsupport be of the same wilful or deliberate character as that defined in the criminal code. See *State v. Francis,* 126 Or 253, 268, 269 P 878 (1928)." *Wilcox v. Alexander et ux,* 220 Or at 514-15.

Appellant admitted an average monthly income above the poverty level for the year prior to the filing of the petition. In the absence of evidence of special circumstances, it is not unreasonable to conclude that he could have contributed to his child's support and chose not to do so—without even concerning himself as to whether she was being adequately cared for by others.

The common theme that exists in criminal nonsupport cases as well as adoption and termination proceedings is that a parent must do "the best he can."

"A wicked intent is not an essential element of the crime of failure to support * * * but * * *

the failure spoken of in the act means 'a willful or negligent failure to provide, and not mere failure on account of inability.' The defendant is not required to do the impossible * * * it is the duty of the father 'to do the best he can' to support his child 'in the manner suitable to his station and circumstances.' " *State v. Langford,* 90 Or 251, 265, 176 P 197 (1918); *see, State v. Francis,* 126 Or 253, 268, 269 P 878 (1928).

In *Wilcox v. Alexander et ux,* supra, the court allowed an adoption over the father's objection because the father had refused to pay support when his ex-wife would not permit the children to visit him. There was ample evidence that the dispute about visitation arose out of the father's attempt to alienate the children from the mother. His failure to pay support was both intentional and without just and sufficient cause.

*Smith v. Green,* 4 Or App 533, 480 P2d 437 (1971), involved the same statutory language we are dealing with here. In that case we affirmed a decree denying a petition for adoption. The parents gave the child to an aunt of the father when all the parties lived in Utah. The aunt and her family later moved to Grants Pass, Oregon, and took the child with them. The parents did not visit the child, even when they were in the vicinity, and contributed no support over a period of five years.

■ Nevertheless, *Smith v. Green,* supra, presented a significantly different situation from that presented by this case. There the parents knew the woman who took the child and knew the child's whereabouts through mutual relatives. The aunt took the child pursuant to a written contract, which was valid in Utah, in which she and her husband promised to support and maintain the child and give her the same love and

affection they gave their own children. The aunt and her husband thereby relieved the natural parents of their legal obligation to support the child. The parents chose these people and took steps to assure the child's well-being. Here, the father knowing only that his child was in the custody of the welfare commission, and nothing more, deliberately chose to ignore her, totally and completely, until if and when it suited his convenience and desires to do otherwise.

Affirmed.