Argued April 15, reversed and remanded June 11, reconsideration
denied July 17, petition for review denied July 22, 1974

In the Matter of the Dissolution of the Marriage of
HASTINGS, *Respondent, and* HASTINGS
(No. 375-427), *Appellant.*
523 P2d 569

*William G. Whitney,* Portland, argued the cause
and filed the brief for appellant.

*Gregg H. Ireland,* Portland, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Langtry and Fort, Judges.

FORT, J.

This is an appeal by the father from an order denying his motion for change of custody of his son, Robert.

The boy was born January 23, 1968. At that time, the mother was married to one Rost, from whom she was divorced in August 1968. She married Clyde Gerald Hastings, appellant herein, on October 31, 1968.

The record shows that the mother, in her petition for dissolution of the marriage filed December 7, 1971, alleged there were no children born of the marriage. Appellant father filed an answer alleging that he was the father of Robert. The court so found and awarded him temporary custody of the boy, but in the final order gave custody to the mother. No appeal was taken. Mrs. Hastings was then 26 years old and Clyde Hastings was 43.

Immediately following the 60-day waiting period, Mrs. Hastings remarried, this time to her stepson, David Hastings, the son of appellant herein. At the time of the dissolution of her first Hastings marriage on August 23, 1972, Mrs. Hastings was pregnant. It is admitted that the father of this child was her stepson, David Hastings. That baby was born October 5, 1972. She and David were married three weeks later. David Hastings thus became the stepfather of his half-brother, Robert.

During the 60-day waiting period, Clyde Hastings sought modification of the dissolution order of his marriage to Mrs. Hastings to gain custody of Robert on the ground that his former wife, with Robert, was living with his son David in a meretricious relationship. Although the court ordered that Mrs. Hastings might not reside with David Hastings until their marriage could take place, it refused to modify the order and left Robert with his mother. There was no appeal.

During the course of that proceeding, we note that the trial judge, on September 5, 1972, entered an order holding Mrs. Hastings in contempt for "wilfully withholding * * * [Robert] beyond the established visitation period" and directed "that a warrant should issue for her arrest."

On April 10, 1973, the father again filed a motion to modify the order of dissolution by transferring custody of Robert to him because:

"* * * On the occassions [sic] of the last three visitation periods with my son, the minor child of the parties hereto, I became aware of bruises, scrapes, scars and other signs of battering on his body, showing evidence of being abused."

The trial court denied the motion on May 30, 1973, but provided in its order as follows:

"* * * * *

"2. The mother of Bobby Hastings and step father, David Hastings, are hereby directed to contact the child guidance clinic directed by Dr. Carl Morrison and make arrangements for parental guidance classes involving themselves and the child.

"* * * * * *"

On August 7, 1973, the father, Clyde Hastings, again sought modification of the dissolution order

by appropriate motion and affidavit.[1] This appeal is from the order denying the motion to modify. We review de novo.

We do not here have the benefit of the findings

---

[1] Excerpt from affidavit of father, Clyde Hastings, attached to motion filed August 7, 1973:

"* * * Since the last hearing on this case, there have been numerous activities on the part of my former wife either actively on her part, or condoned by her have given rise to my filing a Motion for an Order To Show Cause. The discipline that has been imposed upon the minor child of the parties, to-wit ROBERT ALLEN HASTINGS, born January 23, 1968 has been such as to endanger his mental and physical health. The mental and physical abuses occurring against my son are as follows:

"1. Bobby has been subjected to punishment by means of prolonged ice baths, wherein ice cold water was placed in the bathtub, and a washrag was stuffed in his mouth, all as punishment for infractions imposed by his custodial parents.

"2. He has been forced to stay in the corner facing the wall for periods exceeding four hours at a time, without talking, moving, or allowed to go to the toilet.

"3. As a punishment, he has been forced to stay on the toilet from the moment he woke up, except for meals, until the moment he went to bed.

"4. On numerous occasions during the course of the last two and one half months, punishment has been inflicted upon him, causing bruises on his legs, back, arms, and nose. Also, he has received a cut on his head, requiring many stitches.

"5. His foot has been stomped upon as a punishment causing his toes to swell to a point that his shoe would not fit on his foot.

"6. He has been taken to taverns and bars by his parents at late hours until midnight.

"7. He has been subjected to mental abuse and threats that if a proceeding were brought to take him from his mother, he would never see his father again.

"8. Although ordered to do so, his parents have not sought help or guidance as ordered by this court on previous occasions from the child guidance clinic.

"9. Although ordered by this court, Bobby has not been taken to a Child psycologist [sic] for evaluation.

"10. If the Petitioner herself has not inflicted these punishments, she has been aware of the punishment and has condoned it, or has allowed the minor child to remain under circumstances resulting in the punishment to the child."

of fact by the trial judge. However, certain facts are established from the transcript and the record as having occurred since the order of May 30:

1) The mother and stepfather did not comply with the order of May 30, 1973, until after the present motion to modify was filed on August 7, 1973. The report from the Morrison clinic shows that contact was first had by the mother on August 29, 1973;

2) The stepfather, David Hastings, with the knowledge and apparent approval of the child's mother, had inflicted severe[2] corporal punishment, both before and after the May 30 order, by hand and by strapping with a belt, upon his half brother-stepson, Robert;

3) The child had been subjected to ice baths by the stepfather;

4) The child had had rags stuffed into his mouth by his stepfather;

5) The child's stepfather had hit him, apparently with his fist;

---

[2] There were no findings of fact made by the trial court; however, we quote the following from the trial judge's remarks at the conclusion of the hearing:

"The matter was before the Court in March, and while we are concerned only with the change of circumstances between March and now, the Court cannot help but notice the exhibits and the apparent bruises in March that were substantially in excess of those in July. There are definitely one or two strap marks in the pictures that I've received in evidence as Exhibits 1, 2, and 3. But the Polaroid exhibits before Judge Dahl back in March clearly had multiple blows.

"* * * * *

"* * * The child had been spanked and spanked way too hard.

"This Court cannot and will not condone stuffing rags in a youngster's mouth or ice baths. Beatings have troubled the courts for years and always have. This child was strapped much more than he should have been."

6) The mother worked evenings as a cocktail waitress, getting off work at 10:30 p.m.;⑨

7) The mother returned to her home from her work frequently as late as 3:30 a.m., the child remaining at her home with a babysitter;

8) On many of these occasions, the mother was engaged after work in visiting other taverns and nightclubs;

9) During the two months prior to this hearing, the mother and the stepfather were living apart from one another; and

10) David Hastings insisted at the hearing that Bobby, the child here in question, was not the son of Clyde Hastings.

Thus it is clear from the foregoing that there was indeed a change of circumstances between the May 30 order and the filing of the motion to modify the decree on August 7, 1973. These changes were substantial. The question remains whether or not, based thereon,

⑨ Pertinent parts of the judge's remarks at the conclusion of the hearing also include:

"The other thing that disturbs me a great deal is Exhibits 4 and 6. I can't understand a woman who professes to love her children keeping the hours that Mrs. Hastings does. Exhibit 6 is the schedule showing when Mrs. Hastings goes to work and when she quits work. Exhibit 4 is the record from the babysitter showing the hours for when she gets paid. It's not as clear as it might be, but it would appear that on many occasions when Mother is off work at 10:30 at night, she doesn't get home until 3:30 in the morning.

"What kind of a mother is that?

"MRS. HASTINGS: Can't I be with my husband?

"THE COURT: Once in awhile, but you can come home and be a mother, too.

"This has been day after day for quite a long period of time before she comes home. I would agree that emotional harm is as much as if not greater than physical.

"I'll deny the father's motion for modification."

the court was correct in its decision to leave the boy with his mother. Our task is not rendered any easier by the absence of any findings of fact, particularly in the evaluation of conflicting witness credibility. *Omlie v. Hunt*, 211 Or 472, 316 P2d 528 (1957); *Hannan v. Good Samaritan Hosp.*, 4 Or App 178, 471 P2d 831, 476 P2d 931 (1970), Sup Ct *review denied* (1971).

The trial court, though seriously troubled, as it stated, with crucial aspects of the evidence, concluded that the mother and stepfather had not intended to harm the boy, and that because at the time of the hearing they were finally enrolled in the parental guidance course at the Morrison clinic, the custody should not be changed.

■ In determining what is best for a child, once a substantial change of circumstances has been shown, consideration should be given to what alternatives may be available to the same extent as in the original award of custody in the dissolution proceeding. *Christy v. Christy*, 244 Or 575, 419 P2d 425 (1966); *Gheen v. Gheen*, 247 Or 16, 426 P2d 876 (1967); *Ray v. Ray*, 11 Or App 246, 502 P2d 397 (1972).

The record shows that appellant is a self-employed contractor, that his annual income is $11,000 per year, and that he has made all required support payments. He has an adequate home. Twice within the period of a year the court awarded him temporary custody. Our attention is directed to nothing in the record which would support a conclusion that he is not able or is other than wholly willing, and indeed anxious, to provide a suitable home, care and educational opportunity for Robert. So far as the record shows, appellant, during the periods he has had the boy, has supplied

a fully qualified babysitter during the times his work required him to be away from home, and has furnished good care for him.

■ On the other hand, it is clear that the care given this boy by his mother and stepfather, regardless of their motivation, leaves much to be desired. Under such circumstances, we cannot agree that the child should be left with the mother in the hope that her parental skills, and those of the stepfather, will in time prove adequate to the needs of this child. We conclude that the custody of the child should be awarded to the father. It follows that the decree should also be modified to eliminate the current support payment now required of the father.

Reversed and remanded. Costs to neither party.