Argued May 12, affirmed as modified October 22, 1969,
petition for rehearing denied January 13, 1970

RYF, *Respondent, v.* HOFFMAN CONSTRUC-
TION COMPANY ET AL, *Appellants.*

459 P. 2d 991

*Daryll E. Klein,* Portland, argued the cause for appellants. With him on the brief were McMenamin, Blyth, Jones & Joseph, Portland.

*John J. Haugh,* Portland, argued the cause for respondent. With him on the brief were Pozzi, Wilson & Atchison, Portland.

O'CONNELL, J.

This is an appeal by an employer and a private insurer from a judgment of the circuit court of Multnomah County in a workmen's compensation proceeding.

The claimant, John Ryf, while employed by defendant Hoffman Construction Company, fell on his back from a height of approximately twenty feet causing a compression fracture of a vertebra and out of which a kyphotic relationship (curvature) developed.

The Closing and Evaluation Section of the Workmen's Compensation Board made an award equal to 10% loss by separation of an arm for an unscheduled

disability. Claimant appealed to the Hearing Officer who increased the amount to 35%. The Workmen's Compensation Board affirmed the award of the Hearing Officer. Claimant appealed to the circuit court which increased the award to 50%.

The basis for the award made by the Hearing Officer is stated in his written opinion, the pertinent parts of which are as follows:

"Claimant is a 28 year old construction carpenter who was injured on November 16, 1966, when a panel up-ended as he stepped on it, dropping him 15 or 20 feet to the ground. He landed on his back, and was immediately taken to Columbia District Hospital where he remained for three weeks. He returned to work, but continued to see Dr. Steward because of soreness in his back. He was referred to Dr. John Harder who determined claimant had sustained a compression fracture of the first lumbar vertebra, with a resulting narrowing of the interspace between the 12th dorsal and the 1st lumbar vertebra. There is also a reduction or compression of the height of L-1 by approximately 20%.

"Claimant suffered a polio attack when he was 9 months old, and his right leg is now $1\frac{3}{4}''$ shorter than the left, with generalized atrophy of the musculature of the right leg. Prior to his injury, the disparity in the length in claimant's legs did not cause any problem and did not necessitate his wearing a lift on his right shoe. Since his injury he has been required to wear a built-up shoe as well as a back brace. A co-worker, Phillip Bernier, stated he has known claimant for over six years, and that he used to work up to eleven hours a day, seven days a' week at top speed, but frequently he is now tired after four or five hours work and is much slower than he had been previously.

"Claimant's back now causes him considerable

difficulty in that working in a bent position for [a] prolonged period of time makes it extremely difficult for him to straighten up, and the amount of weight he can lift is limited. He is now employed as a sawyer and millwright at Packwood Lumber Company, where he operates the head-saw two hours a day, and is on call for plant maintenance the balance of his shift. As a construction carpenter, he received $4.68 per hour, while his present wages are $3.52 per hour. Although construction work is known to be seasonal, there was no evidence as to whether or not claimant's present job is seasonal. Generally, sawmill work is steady.

"Dr. Harder reported in his letter of June 2, 1967, 'He has a good range of motion in his dorsolumbar spine without any particular pain. He has some tenderness over the upper lumbar region to digital pressure in the mid-line. There is no muscle spasm present now. Neurological examination is negative except for the fact that he has the atrophied right leg * * *. Leg test and sensation to pin prick and light touch and tendon reflexes testing are normal, taking into consideration the atrophy and the hyper-development of the right leg. X-rays of the lumbar spine at L-1 in the upper lumbar segment reveals the compression fracture of the first lumbar vertbra to be solidly healed with bridging anteriorly of this interspace by calcification.' In his discussion, Dr. Harder goes on to say 'He will be unable to do heavy lifting or excessive bending or anything that puts heavy strain on his back, or constant motion of his back * * *.'

"Larson (2 Larson's Workmen's Compensation Law 1; Section 57.00) states: 'Compensable disability is inability, as the result of a work-connected injury, to perform or obtain work suitable to the claimant's qualification or training. The degree of disability depends on impairment of earning capacity, which in turn is presumptively determined by comparing pre-injury earnings with post-

injury earning ability;' In Lindeman v. SIAC, 183 Or 245, 192 P2d 723, the court stated 'The statute provides no compensation for physical pain or discomfort. It is limited to the loss of earning capacity. The loss of capacity to earn is the basis upon which compensation should be based.' Previously, claimant earned $4.68 an hour as a construction carpenter and following his injury, he returned to construction work building light panels. He could still do light carpentry if it were available. His injury has affected his stamina as well as his ability to work rapidly, and seriously hindered his lifting, climbing ladders, stooping and crawling about in restricted places. Dr. Harder's prognosis was for his condition to become progressively worse, although not a great deal, but there is little likelihood his condition will improve.

"I find claimant has permanent partial disability equal to 35% loss of an arm by separation for unscheduled back disability."

The trial judge, making his own independent evaluation of the record certified from the Hearing Officer, decided that plaintiff's award should be increased to equal 50% loss by separation of an arm for an unscheduled disability. The basis for the trial judge's award is set out in the following letter opinion:

"The Court adopts the findings of the Hearings Officer, Page Pferdner, with the exception of [certain] matters * * * pertaining to the testimony of Dr. Harder. I believe he had not fully considered the testimony of Dr. Harder as compared to the letters submitted by the various doctors which were made a part of the record. * * * Dr. Harder states:

" 'There were changes in the interspace between the twelfth dorsal and the first lumbar vertebrae, the narrowing of that interspace.'

"* * * [H]e further expands on the injury of the claimant and increases the percentage of compression. In his letter he stated 20 per cent; in his testimony, * * * he says, 'It is probably 30 to 35 per cent of the height which has been lost, . . . .' He also says he should avoid work such as heavy construction. It is also evident that Dr. Harder's testimony doesn't agree with that of Dr. Wandel or Dr. Satterwhite. Dr. Harder has appeared before this Court many times as an expert witness. I would consider him very competent and a conservative doctor in his approach to these matters. In one of his letters he states that this type of injury has more effect and is more disabling to one such as the claimant, who previously suffered from polio and had a short leg as a result thereof. For this reason I believe both the Hearings Officer and the Workmen's Compensation Board have been too conservative to a man such as the claimant who is fitted only for manual labor and now hopes to qualify as a certified welder.

"For the above reason, the Court finds that claimant has permanent partial disability equal to 50-per cent loss of an arm by separation for unscheduled back disability. It is true from the medical testimony that this defendant might have further disability in older age, but, as pointed out by the order of the Board on Review, any future worsening of the condition should be based on medical testimony in the future and not at this time. Counsel for claimant will submit an order accordingly, including attorney fees set by the Minimum Fee Schedule as provided by the statute."

It appears from the foregoing opinion that the trial judge attached considerable significance to the fact that the Hearing Officer had accepted Dr. Harder's first estimate of the compression which was calculated to be 20 per cent and failed to consider Dr.

Harder's later estimate of a 30 to 35 per cent reduction.①

We have no way of knowing what the trial judge's estimate would have been had he not placed such emphasis on Dr. Harder's subsequent calculation of the percentage of compression. It is probable that he would have found less than a 50 per cent disability. However, in view of the trial judge's further emphasis upon Dr. Harder's testimony concerning the disabling effect of the injury suffered by plaintiff, it is likely that the estimate would be more than that made by the Hearing Officer.

■ In arriving at his estimate the Hearing Officer apparently was strongly influenced by the factor of comparative earnings before and after the injury. The Hearing Officer found that claimant's hourly rate of pay had decreased from $4.68 before the accident to $3.52 after the accident. The accident report filed with the Workmen's Compensation Board indicated that claimant's hourly wage prior to the injury was $4.68. However, claimant testified at the hearing

---

① Dr. Wilmer Cauthorn Smith, former chief medical adviser to the Oregon State Industrial Accident Commission, in his book, Principles of Disability Evaluation (1959), states that:

"* * * In general, either definite compression fracture of a vertebral body amounting to a reduction of 25 per cent or more in its anterior vertical height or spinal fusion carries an average permanent disability of from 30 to 50 per cent of unscheduled disability."

It is not clear from the trial judge's opinion why he regarded as significant the Hearing Officer's failure to use Dr. Harder's later estimate of the compression, increasing it from 20 per cent to 30 or 35 per cent. If the trial judge meant to say that the degree of compression or reduction is equated with the degree of disability, and that a 35 per cent reduction would be more disabling than a 30 or 25 per cent reduction, then, in our opinion, his calculation would be erroneous because as we understand it the degree of disability does not increase correspondingly with the increase in the degree of reduction or compression.

that his rate of pay had been $5.03 per hour prior to the accident. Defendants made no effort to contradict this testimony either by cross-examination or by their own witnesses. We see no reason for rejecting claimant's statement at the hearing and substituting it for the figure contained in the accident report.

The foregoing examination of the opinion of the Hearing Officer and the opinion of the trial judge reveals that both may have relied upon some factors which we would not regard as acceptable in arriving at our own estimate.

The trial judge relied principally upon Dr. Harder's testimony and chose to reject the evaluations of the other doctors, giving as his reason his respect for Dr. Harder's competence gained through observing him as a witness on previous occasions. The Hearing Officer may have had a higher regard for the other medical witness as a result of his observations of them in the hearing room in previous cases. The members of this court, in making their de novo judgment, do not have the opportunity to make a comparison of the talents of medical witnesses. If we were to accept such an *ad hominem* approach in the adjudication of claims under the Workmen's Compensation Act certainly we as well as the trial judge would have to give some weight to the fact that the Hearing Officer, and he alone, has the opportunity to observe the claimant and other witnesses, a factor which we have regarded as highly significant in reviewing other cases on appeal.

■■ In reviewing Workmen's Compensation cases it is not proper for us to consider the special talents or knowledge of *any individual judge* in the field of Workmen's Compensation law or any other area of

the law. However, it is proper for us to consider the expertise of a government agency *as a whole,* whether an administrative body or a trial court. This was the import of our holding in *Romero v. State Compensation Dept.,* 250 Or 368, 440 P2d 866 (1968), when we said:

> "* * * [W]e are entitled to take into account the administrative agency's expertise which develops out of dealing with hundreds of similar cases."

As the present case illustrates, we may decide that the administrative officer erred in rejecting or accepting certain evidence or erred in some other procedural way. And we are free to exercise our judgment in the appraisal of the evidence to the extent that we can do so from an examination of the record. But this is not in derogation of the basic idea expressed in *Romero.*

■ As we explained in *Coday v. Willamette Tug & Barge Co.,* 250 Or 39, 440 P2d 224 (1968), we are charged by statute with the duty of making our own de novo determination of the degree of claimant's disability and consequently we cannot rest our opinion on the usual principle that the trial court's conclusion will be accepted if supported by substantial evidence.

It would be gratifying to us if we could point to factors which would aid us in making our own estimate of plaintiff's disability. Unfortunately we find nothing in the record and little of which we can take judicial notice that serves as criteria in arriving at the percentage of the claimant's disability. We have noted claimant's testimony to the effect that his present ability to work has been reduced 50% as a result

of the accident. This testimony is, of course, self-serving and must be viewed with caution. Claimant's disability was greater than that usually resulting from a compression fracture for the reason that he had suffered a polio attack as a child which resulted in atrophy of the muscles of his right leg and in a shortening of the leg. The evidence would also suggest that claimant's stoical attitude may have prompted him to work under circumstances which other workmen without such a disposition might find intolerable.

■ In making our estimate of claimant's disability we shall assume that his actual earnings were, as he testified, $5.03 and $3.52 respectively, before and after his injury. Actual earnings are important but not the sole basis for measuring earning capacity. This is demonstrated by the cases which recognize that a disability award may be sustained even though it is shown that after the accident the claimant received wages equivalent to or greater than those received prior to the accident. Actual wages earned over a short period of time after the accident are not necessarily the measure of the claimant's earning capacity for various reasons.

> "* * * Unreliability of post-injury earnings may be due to a number of things: increase in general wage levels since the time of accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings." 2 Larson's Workmen's Compensation Law, § 57.21, p. 27 (1968).

Larson further explains:

"What all this adds up to is an attempt to extend to non-schedule permanent partial injuries the schedule-injury presumption that a definite permanent physical impairment will probably, sooner or later, have an adverse effect on earning capacity. It may be years before the effect is felt. But a man with a stiffened arm, or damaged back, or badly weakened eye will presumably have a harder time doing his work well and meeting the competition of young and healthy men. His efficiency may deteriorate gradually and imperceptibly. He may have difficulty in retaining employment, if he has occasion to change jobs. If this general idea is valid enough to support a schedule award for loss of a part of a little finger, it should also be valid for permanent injuries of a more generalized sort. Larson, supra § 57.31 at p. 55.

Taking heed of Larson's admonition to consider other factors, we note especially the enhancement of claimant's disability as a consequence of his previous illness resulting in muscle atrophy and the shortening of his leg. It is difficult to calculate the extent to which this and other factors would reduce claimant's earning capacity. Dr. Harder indicated simply that the claimant would be "unable to do heavy lifting or excessive bending or anything that puts heavy strain on his back or constant motion of his back, unless he has considerable pain associated with this." When asked to describe the limitations on claimant's use of his back, Dr. Harder testified that it would be "mainly putting force on this area of the back; and force on this area of the back in such things as flexion, bending forward, in lifting, anything where you have to lift heavy; and the worst thing would be a combination of the two where you bent forward and lifted at the same time. This would put the most force on

it and cause the greatest effects." The other doctors reporting on the injury did not describe in as much detail its disabling character.

■ Upon the basis of this evidence we have concluded that plaintiff's unscheduled injury is equal to 40% loss by separation of an arm. This is 5% more than the award made by the Hearing Officer. However, his award was made upon the assumption that plaintiff's hourly wage rate before the injury was $4.68, whereas we find that the pre-injury rate was $5.03. This greater difference in loss of earnings indicating a greater work disability should be reflected in the award.

The cause is remanded with directions to enter a judgment for an award equal to 40% loss by separation of an arm.

Judgment modified.

SLOAN, J., dissenting.

Both the hearing officer and the majority place undue emphasis on plaintiff's immediate loss of earnings. It is doubtful to me, for the reasons that follow, that our statutes contemplate the use of wage loss as a basis for determining the extent of disability. The quotations in the majority opinion reflect the lack of reliability in the use of such a test which has probably been why the legislature has not adopted a loss of wage test in any prior or present statute. As stated by Evans, Workmen's Compensation in Oregon, 1951, 31 Or L Rev 28, 36:

"* * * The Oregon act differs from most other compensation acts in that the amount payable under the act for such a disability bears no direct relation to the former earning power, or the diminished earning power, of the injured workman. The amount of compensation paid is directly pro-

portional to the functional loss the workman has sustained. * * *."

Before the present decision, permanent partial disability has always been measured entirely by loss of bodily function. It has been physical, not monetary, evaluation. Evidence of earnings, either before or after injury was irrelevant. The trier of the fact decided disability without any reference to earnings. *Cain v. State Ind. Acc. Comm.*, 1934, 149 Or 29, 37 P2d 353, 96 ALR 1072.

An examination of our statutes, from the inception of the workmen's compensation act, sustains the quotation from Evans, and explains why all of the prior cases have tested disability by loss of bodily functions. The Oregon basis for measuring permanent partial disability has been unique. In a comparative study by Somers, Workmen's Compensation, 1954, Oregon is revealed to be one of the few states that does not, in some way, equate such disability to weekly wages.

Starting with ch 112, Oregon Laws 1913, permanent partial disability for scheduled injuries was based upon periods of time measured in months. *Cain v. Ind. Acc. Comm., supra.* The 1913 Act provided that non-scheduled disabilities were determined by the "relation to the periods stated in this clause as the disabilities bear to those produced by the injuries named in this schedule." A 1935 amendment, changed the monthly-time method of computing disability to one of degrees. Oregon Laws, 1935, ch 46. The 1935 amendment also provided that the degrees of disability for a non-scheduled injury "shall be computed by determining the disabling effect of such injury as compared with any disability named in the above

schedule." That test for computing permanent partial disability has remained unchanged until a 1967 amendment, Oregon Laws 1967, ch 529, which now provides that the measurement of disability shall be "determined by the extent of the disability compared to the workman before such injury and without such disability."

Prior to 1965, juries were told to measure permanent partial disability in terms of the percentage of loss of the functions of a scheduled injury. As above stated, the amount of a workman's earnings was not relevant at any level of disability determination. *Cain v. State Ind. Acc. Comm., supra,* at 34; 2 Willamette L J 8 (1962). This appears to have been a relatively satisfactory test as evidenced by its long legislative approval.

It is apparent from an examination of the Act that the legislature has been conscious of a wage differential test. In respect to temporary partial disability ORS 656.212 provides:

"When the disability is or becomes partial only and is temporary in character, the workman shall receive for a period not exceeding two years that proportion of the payments provided for temporary total disability which his loss of earning power at any kind of work bears to his earning power existing at the time of the occurrence of the injury."

With the exception of a minor change in wording made by ch 672 Oregon Laws 1953, this section has remained unchanged since 1933, and was continued in the 1965 revision. In the struggle that preceded and continued during the 1965 revision it is difficult to believe that this distinction went unnoticed. It can be inferred, therefore, that the legislative use of a non-

wage related measure of disability in the permanent, partial disability cases was a deliberate one. It is true that *Lindeman v. State Indus. Acc. Comm.*, 1948, 183 Or 245, 250, 192 P2d 732, citing Rhode Island and Massachusetts cases, the court did state that "the loss of capacity to earn is the basis upon which compensation should be based." The statement was immaterial to the decision in the case so no explanation was made of how "capacity to earn" was to be measured. There has not been any further illumination. Even so, the loss of capacity to earn is certainly not the equivalent of loss of wages. By contrast, in *Kajundzich v. State Ind. Acc. Com.*, 1940, 164 Or 510 at 512, 102 P2d 924, Mr. Justice BELT, for the court, said that "Furthermore, the statute applies to all workmen alike. The violinist who loses a finger receives the same compensation under the workmen's compensation act as the ditch digger who loses his fingers in the course of his employment, even though such injury differs greatly with individuals as to the impairment of ability to earn a livelihood."

We are, however, informed by § 11.44, Workmen's Compensation Coverage in Oregon, an Oracle publication, 1968, that "hearing officers under the new Act are interpreting the *Lindeman* and *Kajundzich* cases to mean that in scheduled injury cases a man's earning capacity before the injury is not considered in arriving at the disability evaluation, whereas in unscheduled injury cases the workman's earning capacity, if impaired, is considered." What change was made in the "new Act" to warrant this departure from the former loss of bodily function test is not disclosed. There is nothing in the amendments to the relevant sections of the former Act which justify the change.

If there is justification for adopting the distinction made by the hearing officers between scheduled and non-scheduled injuries in arriving at the extent of disability, there should, at least, be some explanation as to why the "new Act" requires the change. It should also be explained why the new formula provides a more accurate and uniform measurement of disability than the long standing test previously used. The answer is not to be found in the statutes and an unexplained assumption is not enough.

The use of the majority's formula in this case demonstrates that it can be unfair. Its application here allows plaintiff 30 percent of the loss of an arm just because this is equal to the percentage equal his present loss in wages and only an additional 10 percent for the other factors. The failure of the use of immediate wage has to provide a fair and accurate measure of disability is reflected in this case. It seems apparent that plaintiff has suffered disability of more than a total of 40 percent of the loss of use of an arm. Plaintiff's ability to work has been reduced below the level of a man with one good arm and a 60 percent use of the other. Yet by comparing wages, this is the result reached.

The evidence is undisputed that plaintiff had been a capable, conscientious craftsman in the construction industry; the best use of his abilities. Now he is deprived of the opportunity to compete for the high wages paid such a craftsman. It is undisputed that his condition will degenerate and he will be progressively unable to work in any capacity that requires lifting anything of consequential weight. This will substantially impair his ability to compete in any job market. On his shortened leg he must now wear a

lift. The primary reliance on the wage differential, a differential that is obviously presently reduced by plaintiff's "stoical" determination to work, deprives plaintiff of a fair measurement of his disability. *Hoffmeister v. State I. A. Com.*, 1945, 176 Or 216, 222, 156 P2d 834. Plaintiff's disability should be measured by his total physical disabilities. So measured they would at least equal 50 percent of an arm.

GOODWIN, J., joins in this dissent.