Argued January 5, modified May 26, 1971

SURRATT, *Petitioner, v.* GUNDERSON BROS.
ENGINEERING CORP., *Respondent.*

485 P2d 410

*James J. Kennedy,* Portland, argued the cause for petitioner. With him on the briefs were Ryan & Kennedy, Portland.

*Ridgway K. Foley, Jr.,* Portland, argued the cause for respondent. With him on the briefs were Robert E. Joseph, Jr., and Mautz, Souther, Spaulding, Kinsey & Williamson, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL, and BRYSON, Justices.

HOLMAN, J.

Claimant injured his back while working for defendant, a direct responsibility employer under the Workmen's Compensation Act. As a result of the injury, claimant subsequently had some of the vertebrae in his lower back fused. The operation was only partially successful, leaving him with a pseudarthrosis, a false joint produced by an imperfect fusion of the vertebrae. The dispute involves the amount of his disability.

Claimant originally was awarded permanent partial disability equal to 40 per cent loss of an arm by separation for unscheduled disability to his back. He demanded a hearing, which was granted, and the hearing officer affirmed the award. Upon review, the Workmen's Compensation Board affirmed the hearing officer. Claimant then appealed to the circuit court. The award for unscheduled disability to claimant's back was there raised to equal 90 per cent loss of use of an arm by separation and, in addition, a 20 per cent scheduled disability was awarded for the loss of use of each leg. The employer appealed to the Court of Appeals which cut the award back to that which was approved by the Board. 3 Or App 228, 471 P2d 817 (1970). Claimant then petitioned this court for review, and the petition was granted.

The first issue raised by the petition for review is claimant's contention that, in deciding the amount of claimant's disability, impairment of earning capacity should be taken into consideration in accordance with *Ryf v. Hoffman Construction Co.*, 254 Or 624, 459 P2d 991 (1969). This raises the issue of the proper test to be used in making awards for permanent partial disabilities, and of the import of *Ryf* about which

there seems to be some difference of opinion. The dispute apparently involves whether loss of physical function or loss of earning capacity is the proper overall test, and, in the latter event, the extent to which evidence of intelligence quotient, education, trainability, and such matters is relevant.

In *Ryf*, wages before and after claimant's injuries were considered relevant evidence in determining the extent of claimant's unscheduled disability. The opinion stated: "Actual earnings are important, but not the sole basis for measuring earning capacity." The opinion then proceeded to consider factors other than loss of wages, such as the extent of claimant's physical impairment. Although little had previously been said in this court's opinions concerning the test to be used in determining the extent of unscheduled permanent partial disability, *Ryf* was not the first time that it had been pointed out that loss of earning capacity was the basis for an award of compensation. In *Lindeman v. State Indus. Acc. Comm.*, 183 Or 245, 250, 192 P2d 732 (1948) (dictum), this court said:

> "The statute provides no compensation for physical pain or discomfort. It is limited to the loss of earning ability. The loss of capacity to earn is the basis upon which compensation should be based * * * *."

By statute, Oregon has recognized that disability under the Act and physical impairment were not, for all purposes, equivalent. ORS 656.206 (1)(a) is as follows:

> " 'Permanent total disability' means the loss, including preexisting disability, of both feet or hands, or one foot and one hand, total loss of eyesight or such paralysis or other condition permanently in-

capacitating the workman from regularly perform-
ing any work at a gainful and *suitable* occupation."
(Emphasis ours.)

In considering what is *suitable* employment, it
must have been intended that there be taken into con-
sideration factors other than physical impairment.
What is suitable for two individuals with exactly the
same physical impairment may be, and probably is,
entirely different. If matters other than physical im-
pairment are proper in considering permanent total
disability, there would seem to be no reason why the
same factors should not be taken into consideration in
determining the extent of permanent partial disability,
in the absence of statutory admonition to the contrary.

It is interesting to note that ORS 656.210 pro-
vides that compensation be paid for temporary total
disability on the basis of a percentage of previous
wages within certain upper and lower limits. Also,
ORS 656.212 provides that payments for temporary
partial disability will be as follows:

"* * * [T]he workman shall receive for a per-
iod not exceeding two years that proportion of the
payments provided for temporary total disability
which his loss of earning power at any kind of work
bears to his earning power existing at the time of
the occurrence of the injury."

While the foregoing statutes do not cover permanent
partial disability, which is the relevant issue in this
case, it seems evident that the earning capacity test is
not novel in Oregon.

That earning capacity is the proper test is pointed
out in 2 Larson's Workmen's Compensation Law §
57.00:

"Compensable disability is inability, as the result

of a work-connected injury, to perform or obtain work suitable to the claimant's *qualifications and training*. The degree of disability *depends on impairment of earning capacity*, which in turn is presumptively determined by comparing preinjury earnings with *post-injury earning ability*; * * * ." (Emphasis ours.)

Subsequently, Larson discusses the schools of thought on what disability means in compensation law. He discusses the actual wage loss theory, the "whole man" theory, and the loss-of-earning-capacity theory. He concludes, as follows:

"It has been thought desirable to scrutinize the supposed competing schools of thought about disability at some length because any abandonment of the pervading *impairment-of-earning-capacity concept* in favor of an ill-defined notion that workmen's compensation is designed to indemnify for physical injury as such could raise serious dangers to the system. One danger stems from the utter absence of any yardstick by which to measure in dollars the intrinsic value of individual functions of different parts of the body *to different persons* * * * ." (Emphasis added.) 2 Larson's Workmen's Compensation Law § 57.10 at 16.

1. Impairment of earning capacity cannot be considered in determining awards for specific scheduled permanent partial disabilities because the legislature, by enactment of ORS 656.214 (2) and (3), has conclusively foreclosed further consideration of loss of earnings in such situations. As an illustration, a lawyer and a roofer would, under this schedule, receive exactly the same award for the loss of use of an arm, even though the damage to their earning ability would not be the same. *Kajundzich v. State Ind. Acc. Com.*, 164 Or 510, 512, 102 P2d 924 (1940). Disability for loss of use of a scheduled member is limited to that set

forth in the schedule. *Jones v. State Comp. Department*, 250 Or 177, 178, 441 P2d 242 (1968). In discussing scheduled disabilities, the following statement, found in 2 Larson's Workmen's Compensation Law § 57.10 at 5, is pertinent:

"* * * Permanent partial *schedule* awards, * * * are *based on medical condition* after maximum improvement has been reached, and *ignore wage loss entirely.* Fixed payments for loss of specified members are due even if the claimant during the period is back at work at higher wages than before * * *." (Emphasis ours.)

The fact that virtually all legislative plans have established fixed awards for specific scheduled disabilities is not necessarily an indication that physical impairment is the exclusive basis for determining disability. Larson states as follows:

"Schedule benefits for permanent partial disability are authorized by the statutes of all American jurisdictions, but not under Canadian laws.

"The typical schedule provides that, after the injury has become stabilized and its permanent effects can be appraised, benefits described in terms of regular weekly benefits for specified numbers of weeks shall be paid, * * *. These payments are not dependent on actual wage loss. Evidence that claimant has had actual earnings, or has even been regularly employed at greater earnings than before, is completely immaterial.

"This is not, however, to be interpreted as an erratic deviation from the underlying principle of compensation law—that benefits relate to loss of earning capacity and not to physical injury as such. The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one, instead of a specifically proved one based on the individual's actual wage-loss experience * * *." (Footnotes omitted.) 2

Larson's Workmen's Compensation Law § 58.10 at 88.39-88.42.

The distinction between the methods of determining awards for permanent partial scheduled disabilities as compared with unscheduled disabilities is pointed out by W. C. Smith, M.D.,[1] as follows:

"The medical *evaluation of industrial disability consists of formulating an appraisal of the degree of permanent loss in the ability of an individual to obtain or hold gainful industrial employment.* In the case of scheduled members, evaluation of disability consists of appraising the resulting loss in the ratio between structure or function present and preinjury structure or function. It will be noted that unscheduled disability must be evaluated in reference to general occupational handicap, while scheduled disability is to be evaluated in respect to the scheduled part itself * * *." (Emphasis his.)[2]

"The physician who evaluates total disability and unscheduled partial disability must deal exclusively with the patient's handicap in obtaining or holding gainful employment in the broad field of general industrial occupation * * *."[3]

* * * * *

"The foregoing may be summed up by stating that a concept of the physical energy, the appearance and *the mental ability* required to engage successfully in general industrial occupation constitutes the fundamental norm from which all total and unscheduled partial disabilities are evaluated. Where total disability is being considered, the prime question is whether or not the patient still possesses this energy, appearance and ability to the degree required to meet the demands of regular

[1] Dr. Smith was the Chief Medical Advisor, Oregon State Industrial Accident Commission.

[2] W. C. Smith, Principles of Disability Evaluation 47 (1959).

[3] Id at 53.

gainful employment. In all cases of unscheduled partial disability, the prime question is how much of this preinjury energy, appearance or ability has been lost." (Emphasis ours.)[4]

※　※　※　※　※

"*　*　* *Thus, in evaluating scheduled disability, the examiner deals with the injured part. When he evaluates unscheduled disability, the examiner deals with the entire individual.* In the one, he deals with loss of function in an arm or a leg; in the other, he evaluates the loss of function of the individual as measured by the handicap exerted on his employability by the loss he has suffered. This distinction is basic and cannot be emphasized too strongly." (Emphasis his.)[5]

※　※　※　※　※

"The principle that unscheduled partial disability is a measurement of resulting partial occupational handicap and is not a measurement of physiologic or anatomic loss is, in fact, a logical necessity. Disability in a scheduled member can and, indeed, must be evaluated in terms of that member. This is true because the fact that it is scheduled means that a definite partial disability allowance has been legislatively assigned to that member. Therefore, when the examiner determines that an arm has lost 10 per cent of its function, he evaluates the disability in terms of the arm. This evaluation of 10 per cent of the arm has legal meaning for the administrative agency. It indicates that compensation is to be awarded to the extent of 10 per cent of the statutory allowance provided for the loss of function of the arm. When a member is the subject of statutory scheduling, that member, in effect, becomes the criterion of its loss of function or structure. The fact that this loss of function may represent such a small fraction of the

---

[4] Id at 54.
[5] Id at 118.

entire function of the part that it, in all probability, exerts no adverse effect on the individual's ability to obtain or hold industrial employment is of no concern. Since the partial disability value of a scheduled member is predetermined, any measurable loss of function, however small, constitutes valid partial disability. On the contrary, however, the maximum partial disability value of an unscheduled member is not predetermined. Therefore, evaluation of damage in an unscheduled organ expressed in terms of that organ is not possible, for the reason that such an evaluation would have no significance under a legislative enactment which places no partial disability value on that particular organ."[6]

That the individual workman is taken as the industrial accident finds him with all his inherent defects is apparent from the following:

"The medical logic, then, which underlies unscheduled partial disability is that this type of disability represents partial disability unlimited. It extends from the slightest perceptible handicap to total disability in that patient. It is immaterial whether the patient was, prior to this injury, young and vigorous with a wide range between slightest perceptible handicap and total disability, or whether he was elderly and/or infirm with a relatively narrow range between these two points. In evaluating unscheduled disability, the examiner must never forget that the scale on which he is measuring this disability is the total range *in that patient* between slightest perceptible handicap and total industrial handicap * * *." (Emphasis his.)[7]

It can be argued that when a man of low intelligence quotient suffers a disabling injury to his back he should get no more than an intelligent man

[6] Id at 183-84.
[7] Id at 185.

who suffers the same degree of injury, because the accident did not impair his mental ability which was the same after the accident as before. In fact, however, the intelligent man will suffer a very slight loss of earning capacity because he can be trained for a wide range of employment that does not involve heavy manual labor, whereas the less intelligent one will be reduced to applying for employment as a night watchman or for some other type of employment for which there is little need. To say that their loss of earning capacity attributable to the accident is the same would be completely incongruous. It would be contrary to Larson's admonition that compensable disability is inability to perform or to obtain work suitable to the claimant's qualifications or training. Although it is certainly within the legislature's prerogative to provide that awards for permanent partial disability shall be on the basis of loss of physical function, we believe its intention to do so should be plain. We know of no statutory provision which so indicates except that which authorizes awards for permanent partial scheduled disabilities.

It might also be contended that because unscheduled permanent partial disabilities are compared with scheduled permanent partial disabilities for the purpose of making awards,[9] it was intended by the legislature that the effect of an unscheduled disability on loss of earning capacity be a conclusively presumed one, as in the case of scheduled disabilities. Dr. Smith demonstrates that this is not so when he points out that

---

[9] ORS 656.214 (4): "In all other cases of injury resulting in permanent partial disability, the number of degrees of disability shall be computed by determining the disabling effect of such injury as compared to the loss of any member named in the schedule in this section, not exceeding, however, 192 degrees."

the extent of unscheduled disability is first determined in relation to claimant's loss of industrial employability and then is compared with a scheduled award only for the purpose of translating the claim into money. As a matter of fact, since the occurrence of the injury in this case, the statute has been changed so that permanent partial unscheduled disabilities are no longer compared with scheduled disabilities for the purpose of establishing their monetary value.[9] Had the legislature contemplated that the comparison was for purposes other than that of establishing monetary value, we doubt that the statute would have been changed to its present form.

2. We agree with the Court of Appeals of this state which has applied the earning capacity test in determining permanent partial unscheduled disability and, in doing so, has indicated that it does not believe that it is limited to consideration of the extent of claimant's physical impairment plus loss of wages. It stated in *Hannan v. Good Samaritan Hosp.*, 471 P2d 831, 476 P2d 931, 4 Or App 178 (1970), Sup Ct *review denied* (1971), as follows:

"There is little doubt that claimant's capacity to earn has been severely limited. At the time of his injury claimant was earning approximately $7,000 a year. He has not worked since the surgery of November 1967. He is physically incapable of working as an engineer. He is 61 years old, has average intelligence and only a seventh-grade edu-

[9] ORS 656.214 (4) as amended by Oregon Laws 1967, ch 529, p 1211:

"In all other cases of injury resulting in permanent partial disability, the number of degrees of disability shall be a maximum of 320 degrees determined by the extent of the disability compared to the workman before such injury and without such disability."

cation. His only training is in fields related to his past employment—an employment for which he no longer has the physical qualifications. One examining physician, and a psychologist who examined him for the purpose of vocational rehabilitation, felt that he was unemployable.

"While we do not think the evidence supports the conclusion that he is permanently and totally disabled, it appears unlikely that any employment he may be able to obtain will be nearly as remunerative as the position he held at the time of his injury."

The matter of the proper test with which to determine unscheduled disability has been given detailed consideration because, even in this court, there has been a difference of opinion as to the implications of *Ryf*. It is also apparent that the Workmen's Compensation Board considered only claimant's physical impairment in the instant case. The following is contained in the Board's order:

"The hearing officer affirmed the determination of disability but the Board deems it necessary to correct the discourse by the hearing officer indicating that 'education, economic and social environment' are factors in measuring permanent physical disability. Workmen in the area of partial disability are compensated on the basis of physical loss of function. The college professor and the manual laborer are evaluated similarly. Only in the consideration of permanent total disability, where factors such as 'suitable' employment are inserted in the law, may the other factors mentioned possibly enter the final picture * * *."

We see no specific evidence in this case that the Court of Appeals did or did not use loss of earning capacity as the test. In any event, such loss is the test of the extent of unscheduled disability, but this

does not mean that physical impairment or any other matter relevant to the issue of his earning ability should not be taken into consideration. It was impossible in *Ryf*, on any logical basis, to consider subsequent earnings except on the basis that loss of earning capacity was the proper test. This necessarily meant that any other facts relevant to earning capacity, such as intelligence quotient, education, trainability, etc., could also be considered.

3. As a result, loss of earning capacity is the proper test in determining claimant's unscheduled back disability, but loss of physical function is the sole criterion for determining any scheduled disability because of loss of use of his legs.

4. Claimant next contends that, though his injury was to his back, he is nevertheless entitled to be awarded separate disability for loss of use of his legs in addition to that awarded for his back, in accordance with *Walker v. Compensation Dept.*, 248 Or 195, 432 P2d 1018 (1967). We construe *Walker* to require a separate award for scheduled disability, in addition to unscheduled disability, where injury to an unscheduled portion of the body results both in disability to that portion and in referred disability to a scheduled member. However, this does not mean that the award for disability to a scheduled member should be duplicated in the award for the unscheduled disability. The total disability would be substantially the same even if *Walker* were not the law and one award were permissible under such circumstances. *See Foster v. State Acc. Ins. Fund*, 259 Or 86, 485 P2d 407, (1971), decided this date. Therefore, the issue of *Walker* is almost a pseudo issue. The only difference is that loss of earning capacity may be considered in

connection with an unscheduled award but not in connection with a scheduled one.

5. Claimant's last contention is that the Court of Appeals did not give proper weight to the decision of the circuit court. Because the circuit court did not see the witnesses nor listen to them testify, it is in no better position to decide the case from a cold record than is the Court of Appeals. The usual reason for attaching weight to the trial court's findings does not exist. *Omlie et ux v. Hunt*, 211 Or 472, 476-77, 316 P2d 528 (1957). Neither is the circuit court in any better position to develop expertise in workmen's compensation matters than is the Court of Appeals. In addition, the Court of Appeals is required to try the case de novo on the record. It may give such consideration to the circuit court's decision as it sees fit. *Hannan v. Good Samaritan Hosp.*, 471 P2d 831, 476 P2d 931, 4 Or App 178 (1970), Sup Ct *review denied* (1971).

We now come to our evaluation of claimant's disability. We do not believe the evidence justifies an award for loss of use of his legs. The medical evidence is that claimant has not suffered any loss of leg function. He makes subjective complaints of pain in his thighs. If such pain exists to a considerable degree, he will tire sooner than one who has no such pain, and, thus, it may cause loss of function. *Walker, supra.* However, in evaluating such a subjective complaint and its seriousness, it is necessary to take into consideration other factors. We think the following remark by the hearing officer to be pertinent:

"* * * [C]laimant for practically 2½ years has neither worked, or attempted to work. Thus it is impossible to determine in what manner claimant is unable to do specific work tasks."

Claimant has failed to cooperate in any attempt to determine what he can do; therefore, we are unable to tell whether the claimed pain in his thighs is sufficient to interfere materially with the use of his legs while he is engaged in a normal, gainful occupation. He has not carried his burden of proof.

Claimant does, however, have a serious disability to his back because he now has a spinal fusion. The medical testimony is unanimous to the effect that he can no longer do strenuous manual labor. This is the only kind of employment he has ever had. At the time of his injury, he was 36 years old. He has an 89 intelligence quotient. His arithmetical ability is that of a third grader, and his reading ability is of sixth-grade level. He has no training or skills. He was given various tests to determine whether he was trainable in the assembly of small equipment or in the packaging of goods, neither of which required the use of substantial strength. His scores were poor, as he lacked swiftness, discernment, and the ability to follow printed plans or instructions.

Claimant contends he has an emotional problem which prevents him from trying to work and that this has not been taken into consideration. It is impossible to determine the genuineness of his claimed emotional problem as compared to the possible attraction of continued disability and the income it brings without the necessity of labor. Claimant has damaged his position by what amounts to a refusal even to try. We disregard his contention.

However, it is obvious that claimant's capacity to engage in gainful employment suitable to his abilities has been badly impaired. It is our opinion that the unscheduled disability of his back is equal to 60 per

cent loss of use of an arm by separation. The judgment of the Court of Appeals is modified to this effect.

DENECKE, J., concurring in part; dissenting in part.

I concur in the opinion of Mr. Justice HOLMAN except for that part of the majority opinion which makes a de novo review of the evidence of the extent of disability. I dissent from that part of the opinion.

In *Coday v. Willamette Tug & Barge*, 250 Or 39, 44, 440 P2d 224 (1968), decided before the creation of the Court of Appeals, we held that upon appeal to the Supreme Court from the circuit court we were required by statute to give a de novo review. We indicated that we did not favor that scope of review; however, in view of the wording of the statute we had no choice.

The question now is whether this court is also compelled by statute to grant a de novo review when the case is before us, not on appeal from the circuit court as it was in *Coday*, but because we have granted a petition for review of a decision of the Court of Appeals.

*Coday* held that ORS 656.301 (1) required that we hear de novo an appeal from the circuit court. The statute provides: "Appeals may be taken from the judgment of the circuit court, the scope of review to be the same as that of the circuit court." We construed the statute to require the circuit court to give a de novo review.

The statute applied in *Coday* applies to "appeals from the judgment of the circuit court * * *." The proceeding before this court upon granting a petition for review from the Court of Appeals is not literally

an appeal from a judgment of the circuit court. The appeal from the judgment of the circuit court in workmen's compensation cases is now to the Court of Appeals.

The statutes concerning the Court of Appeals and concerning workmen's compensation are silent on the scope of review of the decisions of the Court of Appeals by the Supreme Court. The only section of the statute creating the Court of Appeals which deals with review by the Supreme Court of Court of Appeals' decisions is ORS 2.520. Subsection (5) provides:

> "After the Supreme Court allows a petition for review, such further proceedings shall be had as the Supreme Court by rule may provide. However, review by the Supreme Court is limited to those errors asserted in the petition for rehearing in the Court of Appeals, unless the Supreme Court shall take notice of plain error apparent on the face of the record."

This court has not made any rule on the scope of review.

In view of the fact that the statute is silent concerning the scope of review by this court of Court of Appeals' decisions, I am of the opinion that it is reasonable to hold that we are at liberty to fix the scope of our review of workmen's compensation cases.

6. *Hannan v. Good Samaritan Hospital,* 4 Or App 178, 471 P2d 831 (1970), well states the inefficiency and uselessness of the present procedure which provides for three de novo trials on the record through the Court of Appeals and four if this court hears the matter de novo. Under such circumstances this court should adopt the rule that we will not review de novo

workmen's compensation cases coming up from the Court of Appeals.

O'CONNELL, C. J., joins in this dissenting opinion.

BRYSON, J., dissenting in part.

I join in the partial dissent of Mr. Justice DENECKE.

The course of a claim under the Workmen's Compensation Act through the administrative level and then the courts is becoming preposterous.

McALLISTER, J., dissenting.

I dissent from the majority opinion insofar as it adopts the assumption in *Ryf v. Hoffman Construction Co.*, 254 Or 624, 459 P2d 991 (1969) that decreased earning capacity is the major factor in the evaluation of permanent partial disability caused by unscheduled injury. Although the majority opinion in *Ryf* did not acknowledge that this approach was a departure from that previously employed in disability evaluation, the dissent pointed out that neither the statutory history of the compensation laws nor prior decisions of this court offered support for measuring disability in these cases in terms of decreased earning capacity. Except for isolated dictum in *Lindeman v. State Indus. Acc. Comm.*, 183 Or 245, 250, 192 P2d 732 (1948) it had been assumed at least since 1940 that the evaluation of permanent partial disability was based solely on physical impairment. In *Kajundzich v. State Ind. Acc. Com.*, 164 Or 510, 512, 102 P2d 924 (1940) the court said:

> "* * * The workman, the commission and the court are bound by the statute fixing the amount of compensation for specific injuries: [citations omitted]. Furthermore, the statute applies to all workmen alike. The violinist who loses a finger re-

ceives the same compensation under the workmen's compensation act as the ditch digger who loses his fingers in the course of his employment, even though such injury differs greatly with individuals as to the impairment of ability to earn a livelihood."

The physical impairment approach was reaffirmed in *Jones v. Compensation Department*, 250 Or 177, 441 P2d 242 (1968).

Both *Kajundzich* and *Jones* involved injuries to scheduled parts of the body. However, until *Ryf* we had never indicated that permanent partial disabilities resulting from unscheduled injuries were to be measured on any different basis than physical or functional impairment. Ten years after *Kajundzich* it appears to have been assumed that the functional loss test applied to all cases of permanent partial disability. Evans, *Workmen's Compensation in Oregon*, 31 Or L Rev 28, 36 (1951).[1] Although I concurred in the *Ryf* opinion, I now think that it was based on an erroneous assumption and that it is a mistake to deliberately adopt and perpetuate that error. Throughout the history of our compensation statutes, there has been no indication of a legislative intent to adopt an independent measure of disability in unscheduled permanent partial disability cases; the statute governing this case indicates the opposite intent. At the time of plaintiff's injury, ORS 656.214 (4) provided that the disability was to be:

> "* * * computed by determining the disabling effect of such injury as compared to the loss of any member named in the schedule in this section, * * *"

---

[1] The author of this article, which was based on a Continuing Legal Education address delivered at the 1950 annual meeting of the Oregon State Bar, had served as an Assistant Attorney General assigned to the State Industrial Accident Commission.

The above provision clearly relates the measurement of the unscheduled disability to those for which the degree of disability had been established by statutory schedule.

Whatever the authorities have to say about the proper theoretical basis for compensation awards, we must look first to our own statutes. Other jurisdictions have found in their statutes a legislative intent to measure disabilities according to loss of physical function rather than decreased earning capacity. *Graf v. National Steel Products Co.*, 225 Mo App 702, 38 SW2d 518 (1931); *Page v. Department of Labor & Industries*, 52 Wash 2d 706, 328 P2d 663 (1958). The theory of the *Kajundzich* and *Jones* cases is not unique.

If the only basis for increasing the award is the application of the earning capacity test, as it appears from the majority opinion, then I think the award approved by the hearing officer and the Board should stand. I would affirm the decision of the Court of Appeals.