Argued and submitted May 5, reversed and remanded July 24, 1980

In the Matter of the Compensation of
Donald E. Woodman.

WOODMAN,
*Petitioner,*

*v.*

GEORGIA-PACIFIC CORPORATION,
*Respondent.*

(WCB 78-5283, CA 14188, SC 26641)

614 P2d 1162

Michael Strooband, of Bischoff, Murray &

Strooband, P.C., Eugene, argued the cause for petitioner. With him on the brief were Doblie, Bischoff & Murray, P.C.

Jack Mattison, of Jaqua & Wheatley, P.C., Eugene, argued the cause and filed a brief for respondent.

Raymond J. Conboy, Portland, filed a brief for the Oregon Trial Lawyers Association as amicus curiae.

Paul R. Bocci, Jr., Portland, filed a brief for Oregon Association of Defense Counsel as amicus curiae. With him on the brief were Schwabe, Williamson, Wyatt, Moore & Roberts, and Robert E. Joseph, Jr.

Before Denecke, Chief Justice, and Tongue, Howell, Lent, Linde, and Peterson, Justices.

LINDE, J.

## LINDE, J.

As a result of an industrial accident in 1974, claimant's left arm was amputated a few inches below the shoulder, and he was fitted with a prosthesis. After further surgical procedures and replacement of the prosthesis due to pain, he returned to work for the employer in 1976 but continued to experience phantom pain and other difficulties. In 1978, the Workers' Compensation Department issued a Determination Order awarding claimant the scheduled 192 degrees of permanent partial disability for 100 percent loss of the arm as prescribed by ORS 656.214(2)(a).[1] Claimant sought an additional award for unscheduled disability of his left shoulder and back. After a hearing, the referee affirmed the determination order. The Workers' Compensation Board modified the order to award claimant an additional 48 degrees of unscheduled disability for 15 percent disability of his upper back.[2] This award was reversed by the Court of Appeals. 42 Or App 899, 601 P2d 909 (1979). We allowed review in order to determine under what circumstances permanent partial disability resulting from an injury which causes a loss scheduled in ORS 656.214(2) may also be compensable as an unscheduled disability under ORS 656.214(5).

---

[1] At the time of claimant's accident, ORS 656.214(2)(a) provided:

"(2) When permanent partial disability results from an injury, the workman shall receive $70 for each degree stated against such disability as follows:

"(a) For the loss of one arm at or above the elbow joint, 192 degrees, or a proportion thereof for losses less than a complete loss."

[2] At the time of this order, ORS 656.214(5) provided:

"In all other cases of injury resulting in permanent partial disability, the number of degrees of disability shall be a maximum of 320 degrees determined by the extent of the disability compared to the workman before such injury and without such disability."

The phrase "extent of the disability compared to the workman" presumably meant "compared to the normal condition, or ability, of the worker" before the injury and without the disability. The section was revised in 1979.

The exact question has not previously been decided by this court, but it is not a new issue. *See, e.g.,* Shemel, Workmen's Compensation Awards for Injuries to Specific Members of the Body, 30 Cornell L Q 218 (1944). The problem is inherent in the structure of the workers' compensation law. Oregon's law, like that of other states, compensates permanent partial disability on two distinct principles. When the injury affects a part of the body specified in the statute—an arm, leg, hand, foot, finger, toe, or joints thereof, an eye or an ear—compensation is awarded for the permanent loss of use or function of the injured member or organ, in an amount fixed by law irrespective of the actual effect on the earning capacity of the particular worker. ORS 656.214(2). In other words, the measure of compensation is the physiological rather than the economic effect of the injury. When permanent disability results from an injury to any other, "unscheduled," part of the body, compensation is measured by the loss of earning capacity, that is, by the loss of economic function. ORS 656.214(5), *supra* note 2; *Surratt v. Gunderson Bros.,* 259 Or 65, 78, 485 P2d 410 (1971); *Ryf v. Hoffman Construction Co.,* 254 Or 624, 459 P2d 991 (1969); *Kajundzich v. State Ind. Acc. Com.,* 164 Or 510, 512, 102 P2d 924 (1940). Both measures are designed to compensate for the economic loss of earning capacity, not for the physical loss as such. The use of prescribed degrees of compensation for the scheduled physiological losses, somewhat like liquidated damages, serves to simplify and expedite settlement of such claims by excluding disputed predictions of the claimant's future earning capacity; but this gain carries the cost that the schedule may sometimes overstate and sometimes understate the actual loss of earning capacity of the injured individual. Predictably, the statutory design comes under strain whenever a scheduled loss has functional consequences that reduce the claimant's earning capacity in substantially greater degree than is provided in the schedule.

On the side of the employer in this case,[3] it is argued that the legislature has fixed and from time to time has adjusted the compensation for permanent partial disability from scheduled losses to reflect what in its judgment are the effects on earning capacity to be expected from such losses in most ordinary occupations, and that it meant this to be the exclusive compensation under the statute. This is also said to extend to those secondary bodily or psychic consequences of a scheduled loss that are so predictable that they must have been contemplated by the legislative scheme. On the side of the claimant it is argued that once the disabling injury extends beyond a scheduled part of the body, it has "spread" to the unscheduled category and is compensable under ORS 656.214(5) regardless whether the "spreading" was an expected or unexpected consequence of the original injury. Only the "inevitable" consequences of a scheduled loss are conceded to be covered by the scheduled measure of compensation.

The Court of Appeals reasonably considered itself bound by language in this court's opinion in *Kajundzich v. State Ind. Acc. Comm., supra,* which quoted an early New York case for the proposition that the scheduled award covers any "usual and expected effect" of the injury to the scheduled part of the body, but that it does not preclude a nonscheduled award for an "actual, although unusual and unexpected, condition" resulting from that injury. 164 Or at 514, quoting *Dowling v. Gates,* 253 NY 108, 110-111, 170 NE 511 (1930). *Kajundzich* itself was a different case. There the issue was whether a scheduled award for injury to a foot precluded an award for a greater degree of disability for injury to the leg, another scheduled member, and the court sustained the larger award on its own review of the facts. Applying the

---

[3] Because of the wide interest in the issue beyond the immediate parties, the Court invited briefs amicus curiae from the Oregon Trial Lawyers Association and the Oregon Association of Defense Counsel. This opinion refers without distinction to the able briefs submitted by the parties and by amici curiae.

same principles to the evidence in a companion case, the court reversed a scheduled award for partial disability of a hand when the injury was to claimant's thumb and there were no separate physiological consequences to the hand but only the loss of function to be expected from the loss of a thumb. *Graham v. State Ind. Acc. Com.,* 164 Or 626, 102 P2d 927 (1940). Neither case involved an unscheduled loss to be measured by reduced earning capacity. Also distinguishable are cases in which a conceded injury to an unscheduled part of the body is accompanied by loss of function of a scheduled part, as in *Surratt v. Gunderson Bros., supra,* 259 Or at 78, *Foster v. S.A.I.F.,* 259 Or 86, 485 P2d 407 (1971); *Walker v. Compensation Dept.,* 248 Or 195, 432 P2d 1018 (1967), for in such cases there is no reason to assume that the legislature meant the existence of a scheduled loss to limit the award for lost earning capacity payable for the unscheduled loss. Still another variation is an injury to a scheduled part of the body that produces a loss of function different from that covered in the schedule, for instance an eye injury causing disability other than loss of vision. ORS 656.214(2)(i); *Russell v. SAIF,* 281 Or 353, 574 P2d 653 (1978) (allowing unscheduled disability rating).

The case now before us presents the question of an injury to a scheduled part of the body affecting an unscheduled area with additional disabling effect. As stated above, the employer contends that the scheduled award is exclusive if the additional effect is "usual" or "expected"; the claimant contends that only "inevitable" effects are excluded. It should be made clear at the outset to what this contest of adjectives is addressed. It is not the probability or certainty of lost earning capacity. Nor is it the probability or certainty that a given operational function of the uninjured parts of the body will be lost because it depends on the missing or disabled member. Both of these consequences clearly are encompassed within the scheduled award. Rather, the dispute concerns the physiological

(possibly also the psychic) consequences of an injury to a scheduled part of the body for other, unscheduled areas. It is a question of medical cause and effect.

If these consequences extend beyond the anatomical limits of the scheduled part itself, they may be said to "spread," as claimant states. One possible reading of the law might be that whenever an injury does extend or spread beyond the limits of a scheduled to an unscheduled area, and the effect on the unscheduled area would itself be recognized as disabling, then the disability would fall within ORS 656.214(5) regardless of its medical probability or improbability. That reading would have the virtue of simplicity. However, petitioner's claim does not go so far. He concedes that to move beyond the scheduled award to unscheduled loss of earning capacity in every such case would go beyond the legislative design when the effect on the unscheduled area is an "inevitable" consequence of the injury to the scheduled member or organ. The disagreement is between that statement of the test and the employer's contention that the legislature meant to incorporate all "usual and expected" effects beyond the scheduled area in the statutory award for the scheduled loss. It becomes a disagreement over the required degree of probability.

There are limits to how much the law can express by adjectives and adverbs. Even the word "inevitable" in this context expresses not a logical necessity but an empirical judgment about the human organism that rests on the current state of clinical knowledge and statistical experience. We shall not attempt a false precision by stating the required relationship to be shown by expert testimony as a numerical percentage of probability discounted by another numerical degree of confidence. We believe that the following is adequate to express the judgment that must be made on adequate evidence when an injury compensable as a scheduled loss is claimed to have caused independently disabling consequences in an unscheduled area.

First, the unscheduled disability must be "independent" in the sense that it would be recognized as a disability impairing the claimant's earning capacity if there had been no loss of use or function in the scheduled member or organ. This only restates the proposition previously stated, that compensation is not payable under ORS 656.214(5) merely because the operational use of an unscheduled part of the body depends on the missing or disabled scheduled part.

Second, the consequential loss in the unscheduled area is included in the scheduled formula when the medical expectation that it will accompany the scheduled loss is so great that its failure to occur would be an exceptional case. So much we believe may fairly be attributed to the legislative purpose in providing a schedule of awards for certain losses of use or function in lieu of individual predictions of lost earning capacity. But we do not think that this legislative assumption extends to secondary consequences beyond the scheduled loss that are merely common or probable. They must be so intrinsic to the original injury (even if delayed) that their failure to follow it would be anomalous and surprising. If the secondary consequences are of this kind, they do not give rise to recovery for unscheduled disability under ORS 656.214(5); otherwise they do.

Third, it is clear that these criteria of probability refer to injuries and their consequences in the relevant population group at large, not to the physical characteristics peculiar to the individual claimant. Whatever disabling effects the legislature included as necessary consequences within the scheduled losses, they would be those common to the general population of working men and women rather than to one or another individual.

The question remains whether the law was misapplied in the present case. Petitioner claimed unscheduled disability in his shoulder and back due to

chronic neuroma in the left shoulder, muscular atrophy in the upper left back, and spinal problems resulting from imbalance after the loss of his left arm. The Workers' Compensation Board stated its review of the medical evidence as follows:

"On November 16, 1977 Dr. Post examined claimant for pain in the shoulder area which was aggravated by the use of the prosthesis. Claimant had tenderness in his back over the left posterior iliac area. Claimant's condition was stationary. Claimant had impairment from painful neuromas and spinal problems to which the imbalance posed by absence of the left arm contributed.

. . . .

"Dr. Post re-examined claimant on August 4, 1978 and found the muscle atrophy in the left upper back to be associated with loss of the limb since the muscles in that area are associated with limb function. The 'bad nerves' in the left shoulder relate to claimant's chronic neuromas. Dr. Post felt that this was claimant's single most significant symptom which he continues to have. He thought claimant's shoulder and back problems were related to his injury.

. . . .

"The Referee found that no medical evidence was in the record to support a finding that claimant had any permanent partial disability in the back and shoulder area and affirmed the Determination Order.

"The Board, on de novo review, finds the medical report of Dr. Post quite clearly relates claimant's upper back and shoulder problems to the industrial injury of October 1974. The Board concludes that claimant is entitled to an award of 15% unscheduled upper back disability in addition to the awards he received by the Determination Order of June 5, 1978."

In reversing the Board's order on its own review of the record, ORS 656.298(6), the Court of Appeals wrote:

"The issue here is whether, having received the full award for his scheduled disability, claimant may

also receive an award for unscheduled disability causally related to the amputation. It is undisputed that claimant suffers from: (1) 'bad nerves' in the left shoulder, related to a chronic neuroma problem in his stump, rendering painful the use of his prosthetic arm; (2) muscle atrophy in the left upper back; and (3) spinal problems, to which the imbalance posed by the absence of his left arm contributes. Uncontroverted medical testimony relates all of these difficulties to claimant's compensable injury.

. . . .

"Here, claimant concedes in his brief that 'atrophy in the left shoulder appears to be a consequence contemplated by loss of a limb.' The atrophy is, therefore, not separately compensable. We reach the same conclusion as to claimant's other complaints. Claimant testified that his back pain, located primarily in his upper back, is caused by imbalance and the inability to brace or support himself while leaning over to perform his welding job, due to the absence of his left arm. Much of his problem in bracing himself results from the pain associated with the use of his prosthetic arm for support, caused in turn by his neuroma condition. The sole medical evidence on this point is to the effect that the absence of his left arm 'contributes' to claimant's spinal problems. Imbalance due to the absence of an arm is precisely the type of difficulty contemplated by the scheduled award for loss of an arm. Claimant produced no medical evidence as to whether his neuroma problem is an expected consequence of amputation. Thus, he failed to carry his burden of proof as to the compensability of his claim."

Unlike the Court of Appeals, this court does not make an independent judgment on the facts. *Weller v. Union Carbide,* 288 Or 27, 29, 602 P2d 259 (1979); *Sahnow v. Fireman's Fund Ins. Co.,* 260 Or 564, 491 P2d 997 (1971). Thus it is necessary to determine whether the Court of Appeals reversed the Board in this case because it disagreed with the Board's view of the evidence or because it misconceived the legal test of compensability. The Board's order, as quoted

above, used the terms "associated with" and "related to" in describing the causal link between the injury to the arm and the consequences for the shoulder and back. These terms are insufficiently precise to show whether the Board found from the evidence that these consequences would or would not follow the amputation of the arm in all but exceptional cases. The opinion of the Court of Appeals stated that the claimant concedes this point with respect to the atrophy. As to the other two asserted complications, we cannot be sure from the excerpt quoted above whether the court would have reached the same evaluation of the record if it had examined it under the legal test as we have stated it. Not being able to make that evaluation here, we are obliged to remand the case for that purpose to the Court of Appeals.

Reversed and remanded.

**PETERSON, J.,** dissenting.

I dissent.

I have no quarrel with the first and third parts of the three-part test set forth on page 558 of the majority opinion. I disagree with the second part of the test for two reasons. First, we are impliedly overruling *Kajundzich v. SIAC,* 164 Or 510, 102 P2d 924 (1940), and *Graham v. SIAC,* 164 Or 626, 102 P2d 927 (1940). Second, I fear that part two of the three-part formula will prove to be difficult to follow and difficult to apply.

### *KAJUNDZICH* AND *GRAHAM* DISCUSSED

The majority states:

"Second, the consequential loss in the unscheduled area is included in the scheduled formula when the medical expectation that it will accompany the scheduled loss is so great that its failure to occur would be an exceptional case. So much we believe may fairly be attributed to the legislative purpose in providing a schedule of awards for certain losses of use or function in lieu of individual predictions of lost

earning capacity. But we do not think that this legislative assumption extends to secondary consequences beyond the scheduled loss that are merely common or probable. They must be so intrinsic to the original injury (even if delayed) that their failure to follow it would be anomalous and surprising. If the secondary consequences are of this kind, they do not give rise to recovery for unscheduled disability under ORS 656.214(5); otherwise they do."

This test differs from the test adopted by this court in 1940 in *Kajundzich* and *Graham.* In *Kajundzich,* a claimant injured his foot and sought compensation for a fracture of the bones of the left ankle, as well as for an injury to the muscles, tendons, ligaments, and nerves of the left leg. A physician testified that the industrial accident destroyed the nerves to his leg, and that it caused the atrophy of his leg. Other doctors attributed the atrophy of the left leg to non-use rather than to nerve injury. This court concluded that there was substantial evidence tending to support the general finding of injury to the leg. As the court characterized the evidence, the claimant's original injury was to his foot, and had spread to the leg.

The court held that the scheduled award did not preclude an additional award for unusual and unexpected conditions which developed as a result of the injury. With respect to the rule applicable to such situations, the court quoted with approval from *Matter of Dowling v. Gates & Co.,* 253 NY 108, 170 NE 511 (1930), which held that:

"A claimant who has suffered a scheduled injury * * * is entitled only to an award of the amount specified in the schedule for such injury in case the effect of the injury is the usual and expected effect. If, however, some unusual and extraordinary condition develops as a result of the injury the fact that the original injury is covered by the schedule does not prevent an award for the actual, although unusual and unexpected, condition which has developed as a result of the accident. * * *" *Id.* at 170 NE 512.

In *Graham,* a worker with preexisting injuries to his fingers suffered total loss of function of the thumb. The plaintiff contended that "by reason of prior injuries to his fingers, and the injury to his thumb, compensation should be awarded on the basis of disability to his hand" (164 Or at 627). Because there were no compensable injuries to parts of the hand other than the thumb, this court held that compensation had to be limited to that provided by the schedule for a thumb injury, even though loss of the thumb necessarily limited use of the hand.

> "The legal principles controlling herein were announced by this court in *Kajundzich v. State Industrial Accident Commission,* this day decided. In that case, claimant sustained an injury to his foot which resulted in disability to the leg. It was alleged and there was some substantial evidence tending to show that the injury to the sciatic nerve extended to the leg and thereby impaired its use. Under such unusual conditions the court sustained an award based on the loss of function of the leg. In the instant case it is not alleged nor is there any evidence tending to show resulting injury to the hand. The statute above mentioned provides compensation for the specific injury of which the claimant complains. Neither the commission nor the court could go beyond its terms. Where a workman's injury is confined to his thumb and there are no unusual or unexpected complications attending injury, compensation for disability resulting from such injury cannot be made on the basis of an injury to the hand." 164 Or at 628.

The applicable rule to be drawn from these cases is clear: Additional compensation may be awarded beyond the amount of the scheduled compensation if additional injuries to other areas of the body are sustained as a result of the scheduled injury, if such resulting injuries are unusual or unexpected. The majority correctly states that neither *Graham* nor *Kajundzich* "involved an unscheduled loss to be measured by reduced earning capacity." This is true, but I can see no difference in substance between a *Graham*

situation (where hand disability resulted from a thumb injury) and the case at bar (where back and shoulder problems allegedly resulted from loss of an arm.)

## THE RULE IS OBSCURE

I fear that the persons working with this formula (the doctors, lawyers, hearings officers and litigants) will find it extremely difficult to understand and apply. The majority states that there "are limits as to how much the law can express by adjectives and adverbs"; that rules that use words such as "usual," "expected," or "inevitable," create a "contest of adjectives."

That may be true, but the test proposed by the majority will result in no improvement so far as adjectival and adverbial contests are concerned. Instead of medical witnesses being asked whether such sequelae "normally" or "inevitably" follow, they will be asked questions such as: Is the medical expectation *great* that the sequelae will follow the scheduled loss? Is the failure of the sequelae to follow the scheduled loss *exceptional?* Are the sequelae *common?* Are the sequelae merely a *probable* as distinct from an *exceptional* result of the scheduled loss? Are the sequelae so *intrinsic to the original injury* that their failure to follow it would be *anomalous* and *surprising?*

The rule, as articulated by the majority, is difficult to understand and apply. If we intend to allow compensation for all unscheduled sequelae other than those as to which the medical expectation that they will accompany the scheduled loss is so great that their failure to occur would be exceptional,[1] it would be better to say that all consequential unscheduled injuries are covered unless they inevitably follow the scheduled loss.

---

[1] This awkward sentence illustrates how difficult it is to state the rule.